**COR Development Company, LLC v. Howe**
**Civil Action No. 5:16-cv-1099**


**Defendant's Letter Motion to Compel**

**Exhibit 1**
**Plaintiff COR's Mandatory Disclosures, Ex. E**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

COR DEVELOPMENT COMPANY, LLC,

                              *Plaintiff,*

     -against-

TODD R. HOWE,

                              *Defendant.*

**PLAINTIFF'S RULE 26
DISCLOSURE**

Case No.: 5:16-cv-1099
(TJM/TWD)

     The Plaintiff, COR DEVELOPMENT COMPANY, LLC, through its attorneys, O'Connell and Aronowitz, P.C., submit the following as the Plaintiff's Initial Disclosure pursuant to Federal Rule of Civil Procedure ("FRCP") 26(a)(1)(A):

     1.     Pursuant to FRCP 26(a)(1)(A)(i), the Plaintiffs are aware of the following individuals who may have discoverable information in support of Plaintiff's claims:

          a.     Mr. Steven Aiello
                 540 Towne Drive
                 Fayetteville, New York 13066
                 (315) 663-2100

                 Mr. Aiello received the request from Defendant Todd Howe for a loan, approved funding the loan and discussed terms of repayment with the Defendant on Plaintiff's behalf.

          b.     Mr. Joseph Gerardi, Esq.
                 540 Towne Drive
                 Fayetteville, New York 13066
                 (315) 663-2100

                 Mr. Gerardi drafted the Promissory Note on behalf of Plaintiff and communicated with Defendant regarding the execution of the Promissory Note and handled issues related to repayment.

c.    Mr. Sean Grooms
540 Towne Drive
Fayetteville, New York 13066
(315) 663-2100

Mr. Grooms is Plaintiff's Chief Financial Officer. Mr. Grooms received email correspondence from Defendant wherein Defendant requested an extension to repay the $85,000 loan;

d.    Ms. Angela Hughes
540 Towne Drive
Fayetteville, New York 13066
(315) 663-2100

Ms. Hughes is Plaintiff's Controller. Ms. Hughes sent the enclosed Demand/Default Letter to the Defendant and received email correspondence from the Defendant requesting an extension to repay the $85,000 loan.

2.    Pursuant to FRCP 26(a)(1)(A)(ii), copies of the following documents are attached:

Exhibit "A":    Executed Promissory Note and Executed Promissory Note Amendment;

Exhibit "B":    Email correspondence between the Defendant and COR regarding the Promissory Note, the Promissory Note Amendment and other issues related to the loan and repayment;

Exhibit "C":    Repayment Check from Defendant;

Exhibit "D":    July 8, 2016 Demand/Default Letter from COR to Defendant; Notice from Berkshire Bank regarding Insufficient Funds on repayment Check; FedEx delivery confirmation for Demand/Default Letter;

Exhibit "E":    Retainer Agreements between WHO Government Solutions and COR, executed by Defendant, on behalf of WHO Government Solutions and Steven Aiello, on behalf of Plaintiff;

2

<u>Exhibit "F"</u>:   Correspondence from Plaintiff to Defendant regarding Promissory Note containing hand written note from Defendant;

<u>Exhibit "G"</u>:   Internal Memorandum from Steven Aiello authorizing wire of loan funds to Defendant

3.     Damages sought include repayment of the $85,000 loan, plus interest.

DATED:    October 25, 2016

O'CONNELL & ARONOWITZ

By:    _____

Scott W. Iseman
Bar Roll No.  518859
*Attorneys for Plaintiff*
Office and P.O. Address
54 State Street, 9th Floor
Albany, NY  12207-2501
Tel.: (518) 462-5601
Fax: (518) 462-2670
Email: siseman@oalaw.com

TO:    Anthony Copani, Esq.

Stuart Pierson, Esq.
*Counsel for Defendant*
Suite 705
1101 17th Street NW
Washington, DC 20036

Richard Morvillo, Esq.
Ellen Murphy, Esq.
*Counsel for Defendant*
500 5th Avenue
43rd Floor
New York, NY 10110

Kenneth Alweis, Esq.
*Counsel for Defendant*
Goldberg Segalia
5786 Widewaters Parkway
Syracuse, NY 13214-1840

3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

COR DEVELOPMENT COMPANY, LLC,

|                                  |                              |
|----------------------------------|------------------------------|
| *Plaintiff,*                     | **AFFIDAVIT OF SERVICE**      |
| -against-                        | Case No.: 5:16-cv-1099 (TJM/TWD) |
| TODD R. HOWE,                    |                              |
| *Defendant.*                     |                              |

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF SARATOGA     )

APRIL C. MCNAB, being duly sworn, deposes and says:

I am over the age of 18 years, I am not a party to this action and I reside in Saratoga County, New York. On October 25, 2016, I served a true and correct copy of **PLAINTIFF'S RULE 26 DISCLOSURE** by depositing the same in a sealed envelope, with postage prepaid thereon, in a post office or official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressees as indicated below:

Stuart Pierson, Esq.
*Counsel for Defendant*
Suite 705
1101 17th Street NW
Washington, DC 20036

Richard Morvillo, Esq.
Ellen Murphy, Esq.
*Counsel for Defendant*
500 5th Avenue
43rd Floor
New York, NY 10110

Kenneth Alweis, Esq.
*Counsel for Defendant*
Goldberg Segalia
5786 Widewaters Parkway
Syracuse, NY 13214-1840

APRIL C. MCNAB

Sworn to before me on this
25th day of October, 2016.

Notary Public

NANCY E. DECKER
Notary Public, State of New York
No. 01DE6147903
Qualified in Saratoga County
Commission Expires June 19, 20 18

4

# EXHIBIT E

# WOH GOVERNMENT SOLUTIONS LLC

SUITE 700
1300 PENNSYLVANIA AVENUE NW
WASHINGTON, D.C. 20004
TEL (202) 204-2585
FAX (202) 204-2586

TODD R. HOWE
President
Email thowe@woh-solutions.com

Steven F. Aiello
President
COR Development Company, LLC
540 Towne Drive
Fayetteville, NY 13066

Dear Mr. Aiello:

This letter will confirm that WOH Government Solutions LLC ["WOH GS"] has been retained by the COR Development Company, LLC ["COR"] as a consultant to help identify potential business opportunities and long-term strategic business development planning strategies for various projects, including but not limited to the Inner Harbor development.

The representation as presently agreed upon will not constitute Federal or State lobbying, and therefore, no registration is required with the US House of Representatives, US Senate, or NYS Jt. Commission on Public Ethics in that capacity. Should the nature of the representation change requiring mandated registration, WOH GS will provide notification to you to expedite registration and will file all subsequent lobbyist reports as required by law in conjunction with the representation.

The term of this representation shall commence March 1, 2016 and run through February 28, 2017. This retainer agreement may be cancelled by either party upon thirty [30] days written notice. In the event of notice of termination, both parties agree to work in good faith toward the purpose of the representation for the thirty [30] day period, if mutually agreeable. Upon termination, COR shall be responsible for payment of all fees accrued to the date of termination.

COR agrees to pay WOH GS $6,500 monthly during the term of the representation, payable upon presentation of invoices from WOH GS. COR further agrees to reimburse WOH GS for all ordinary and reasonable expenses incurred by WOH GS on behalf of COR during the term of the representation. In addition to invoiced expenses, COR agrees to handle the booking and payment of all hotel and air travel costs associated with this representation.

As you know, WOH-GS is a subsidiary of Whiteman Osterman & Hanna LLP. WOH-GS, however, is not a law firm and its employees are not attorneys. Accordingly, lawyer-client privilege or other privileges which may apply to communications between lawyers and clients will not apply to communications with WOH-GS.

If this letter accurately reflects the terms of our retention, we would appreciate it if you would please sign this letter and return an executed copy to us via email or fax as soon as possible. Should you have any questions concerning this letter or any aspect of our engagement, please do not hesitate to contact us.

Very truly yours,

Todd R. Howe

Acknowledged & Agreed

Steven F. Aiello, President
COR Development Company, LLC

On this 14th day of March, 2016.

# WOH GOVERNMENT SOLUTIONS LLC

SUITE 700
1300 PENNSYLVANIA AVENUE NW
WASHINGTON, D.C. 20004
TEL. (202) 204-2395
FAX (202) 204-2396

TODD R. HOWE
President
Email: thowe@woh-solutions.com

Steven F. Aiello
President
COR Development Company, LLC
540 Towne Drive
Fayetteville, NY 13066

Dear Mr. Aiello:

This letter will confirm that WOH Government Solutions LLC ["WOH GS"] has been retained by the COR Development Company, LLC ["COR"] as a consultant to help identify potential business opportunities and long-term strategic business development planning strategies for various projects, including but not limited to the Kennedy Square/Loguen's Crossing development.

The representation as presently agreed upon will not constitute Federal or State lobbying, and therefore, no registration is required with the US House of Representatives, US Senate, or NYS Jt. Commission on Public Ethics in that capacity. Should the nature of the representation change requiring mandated registration, WOH GS will provide notification to you to expedite registration and will file all subsequent lobbyist reports as required by law in conjunction with the representation.

The term of this representation shall commence March 1, 2016 and run through January 31, 2017. This retainer agreement may be cancelled by either party upon thirty [30] days written notice. In the event of notice of termination, both parties agree to work in good faith toward the purpose of the representation for the thirty [30] day period, if mutually agreeable. Upon termination, COR shall be responsible for payment of all fees accrued to the date of termination.

COR agrees to pay WOH GS $7,250 monthly during the term of the representation, payable upon presentation of invoices from WOH GS. COR further agrees to reimburse WOH GS for all ordinary and reasonable expenses incurred by WOH GS on behalf of COR during the term of the representation. In addition to invoiced expenses, COR agrees to handle the booking and payment of all hotel and air travel costs associated with this representation.

As you know, WOH-GS is a subsidiary of Whiteman Osterman & Hanna LLP. WOH-GS, however, is not a law firm and its employees are not attorneys. Accordingly, lawyer-client privilege or other privileges which may apply to communications between lawyers and clients will not apply to communications with WOH-GS.

If this letter accurately reflects the terms of our retention, we would appreciate it if you would please sign this letter and return an executed copy to us via email or fax as soon as possible. Should you have any questions concerning this letter or any aspect of our engagement, please do not hesitate to contact us.

Very truly yours,

Todd R. Howe

Acknowledged & Agreed

Steven F. Aiello, President
COR Development Company, LLC

On this 14th day of March, 2016.

# WOH GOVERNMENT SOLUTIONS LLC

SUITE 700
1300 PENNSYLVANIA AVENUE NW
WASHINGTON, D.C. 20004
TEL (202) 204-2585
FAX (202) 204-2586
woh-solutions.com

TODD R. HOWE
President
Email: thowe@woh-solutions.com

February 7, 2011

Steven F. Aiello
President
COR Development Company, LLC
540 Towne Drive
Fayetteville, NY 13066

Dear Mr. Aiello:

This letter will confirm that WOH Government Solutions LLC ["WOH GS"] has been retained by the COR Development Company, LLC ["COR"] as a consultant to focus on various projects, including but not limited to the Chandler, Arizona Housing Development. WOH-GS will further assist in identifying and assist in the application for funding for such projects, including on the federal, state, and local levels.

The representation as presently agreed upon will not constitute Federal lobbying, and therefore, no registration is required with the US House of Representatives or US Senate in that capacity. Should the nature of the representation change requiring mandated registration, WOH GS will register accordingly with the US House of Representatives and the US Senate and will file all subsequent lobbyist reports as required by law in conjunction with the representation.

The term of this representation shall commence February 1, 2011 and run through January 31, 2012. This retainer agreement may be cancelled by either party upon sixty [60] days written notice. In the event of notice of termination, both parties agree to work in good faith toward the purpose of the representation for the sixty [60] day period. Upon termination, COR shall be responsible for payment of all fees accrued to the date of termination.

COR agrees to pay WOH GS $7,500 monthly upon presentation of invoices on the first of each month from WOH GS. An initial payment of $7,500 payment will accompany the executed agreement. COR further agrees to reimburse WOH GS for all ordinary and reasonable expenses incurred by WOH GS on behalf of COR during the term of the representation. Such invoiced expenses will not exceed $250 per month without prior approval from COR. In addition to invoiced expenses, COR agrees to handle the booking and payment of all hotel and air travel expenses associated with this representation.

As you know, WOH GS is a subsidiary of Whiteman Osterman & Hanna LLP. WOH-GS, however, is not a law firm and its employees are not acting in any roles as attorneys. Accordingly, lawyer-client privilege or other privileges which may apply to communications between lawyers and clients will not apply to communications with WOH-GS. However, WOH GS will treat all communications, work product and other interactions with or on behalf of COR as business confidential.

WOH-GS further agrees that we will not represent other companies engaged in the same line of business as COR in the upstate/central New York region or in the state of Arizona.

If this letter accurately reflects the terms of our retention, we would appreciate it if you would please sign this letter and return an executed copy to us via email or fax as soon as possible. Should you have any questions concerning this letter or any aspect of our engagement, please do not hesitate to contact us.

Very truly yours,

Todd R. Howe

Acknowledged & Agreed

Steven F. Aiello, President
COR Development Company, LLC

On this 7th day of February 7, 2011

# WOH GOVERNMENT SOLUTIONS LLC

SUITE 700
1300 PENNSYLVANIA AVENUE NW
WASHINGTON, D.C. 20004
TEL (202) 204-2505
FAX (202) 204-2506
woh-solutions.com

TODD R. HOWE
President
Email: thowe@woh-solutions.com

November 18, 2010

Steven F. Aiello
President
COR Development Company, LLC
540 Towne Drive
Fayetteville, NY 13066

Dear Mr. Aiello:

This letter will confirm that WOH Government Solutions LLC ["WOH GS"] has been retained by the COR Development Company, LLC ["COR"] as a consultant to focus on various projects, including but not limited to the Inner Harbor, Syracuse, NY and Kennedy Square in Syracuse, NY. In addition, we will help identify potential business opportunities in the upstate and central New York region. WOH-GS will further assist in identifying and assist in the application for funding for such projects, including on the federal, state, and local levels.

The representation as presently agreed upon will not constitute Federal lobbying, and therefore, no registration is required with the US House of Representatives or US Senate in that capacity. Should the nature of the representation change requiring mandated registration, WOH GS will register accordingly with the US House of Representatives and the US Senate and will file all subsequent lobbyist reports as required by law in conjunction with the representation.

The term of this representation shall commence November 1, 2010 and run through October 31, 2011. This retainer agreement may be cancelled by either party upon sixty [60] days written notice. In the event of notice of termination, both parties agree to work in good faith toward the purpose of the representation for the sixty [60] day period. Upon termination, COR shall be responsible for payment of all fees accrued to the date of termination.

COR agrees to pay WOH GS $6,500 monthly upon presentation of invoices on the first of each month, commencing November 1m 2010 from WOH GS. In addition, a one time payment of $6500 payment will accompany the executed agreement. COR further agrees to reimburse WOH GS for all ordinary and reasonable expenses incurred by WOH GS on behalf of COR during the term of the representation. Such invoiced expenses will not exceed $250 per month without prior approval from COR. In addition to invoiced expenses, COR agrees to handle the booking and payment of all hotel and air travel expenses associated with this representation.

As you know, WOH GS is a subsidiary of Whiteman Osterman & Hanna LLP. WOH-GS, however, is not a law firm and its employees are not acting in any roles as attorneys. Accordingly, lawyer-client privilege or other privileges which may apply to communications between lawyers and clients will not apply to communications with WOH-GS. However, WOH GS will treat all communications, work product and other interactions with or on behalf of COR as business confidential.

WOH-GS further agrees that we will not represent other companies engaged in the same line of business as COR in the upstate/central New York region.

If this letter accurately reflects the terms of our retention, we would appreciate it if you would please sign this letter and return an executed copy to us via email or fax as soon as possible. Should you have any questions concerning this letter or any aspect of our engagement, please do not hesitate to contact us.

Very truly yours,

Todd R. Howe

Acknowledged & Agreed

Steven F. Aiello, President
COR Development Company, LLC

On this 19th day of November 2010

**COR Development Company, LLC v. Howe**
**Civil Action No. 5:16-cv-1099**


**Defendant's Letter Motion to Compel**

**Exhibit 2**
**Excerpts from the Criminal Complaint in *United States v. Percoco***

Approved: _James Echenberg / Robert Boone / David Zhou / Matthew Podolsky_
JANIS ECHENBERG/ROBERT BOONE/DAVID ZHOU/MATTHEW PODOLSKY
Assistant United States Attorneys

Before:   THE HONORABLE GABRIEL W. GORENSTEIN
          United States Magistrate Judge
          Southern District of New York

**16 MAG   6005**

- - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA      :
                              :   **SEALED COMPLAINT**
        - v. -                :
                              :   Violations of
JOSEPH PERCOCO,               :   18 U.S.C. §§ 666, 1001,
     a/k/a "Herb,"            :   1349, 1951, and 2
ALAIN KALOYEROS,              :
     a/k/a "Dr. K,"           :
PETER GALBRAITH KELLY, JR.,   :
     a/k/a "Braith,"          :
STEVEN AIELLO,                :   COUNTY OF OFFENSE:
JOSEPH GERARDI,               :   NEW YORK
LOUIS CIMINELLI,              :
MICHAEL LAIPPLE, and          :
KEVIN SCHULER,                :
                              :
          Defendants.         :
                              :
- - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

DELEASSA PENLAND, being duly sworn, deposes and says that she is a Criminal Investigator with the United States Attorney's Office for the Southern District of New York ("USAO"), and charges as follows:

**COUNT ONE**

(Conspiracy to Commit Extortion Under Color of Official Right)

1.   From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York and elsewhere, JOSEPH PERCOCO, a/k/a "Herb," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1951.

2.    It was a part and an object of the conspiracy that JOSEPH PERCOCO, a/k/a "Herb," the defendant, and others known and unknown, willfully and knowingly, would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion as that term is defined in Title 18, United States Code, Section 1951, to wit, PERCOCO, who was a senior official in the Office of the Governor of New York State (the "State"), and others known and unknown, would and did cause companies with business before the State to direct payments to PERCOCO in exchange for official actions taken or to be taken by PERCOCO for the benefit of the companies paying him.

(Title 18, United States Code, Sections 1951.)

## COUNT TWO

(Extortion Under Color of Official Right - The Energy Company)

3.    From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York and elsewhere, JOSEPH PERCOCO, a/k/a "Herb," the defendant, willfully and knowingly, would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion as that term is defined in Title 18, United States Code, Section 1951, to wit, PERCOCO used his official State position and power and authority within the Office of the Governor to cause an energy company seeking benefits and business from the State (the "Energy Company") to make and direct payments to PERCOCO's wife in exchange for official actions taken and agreed to be taken by PERCOCO.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT THREE

(Extortion Under Color of Official Right - The Syracuse Developer)

4.    From at least in or about 2014, up to and including in or about 2015, in the Southern District of New York and elsewhere, JOSEPH PERCOCO, a/k/a "Herb," the defendant, willfully and knowingly, would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion as that term is defined in Title 18, United States Code, Section 1951, to wit, PERCOCO

2

used his official State position and power and authority within the Office of the Governor to cause a Syracuse-based real estate developer seeking benefits and business from the State (the "Syracuse Developer") to make and direct payments to PERCOCO in exchange for official actions taken and agreed to be taken by PERCOCO.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT FOUR

(Conspiracy to Commit Honest Services Fraud)

5.    From at least in or about 2012, up to and including in or about 2015, in the Southern District of New York and elsewhere, JOSEPH PERCOCO, a/k/a "Herb," PETER GALBRAITH KELLY, JR., a/k/a "Braith," STEVEN AIELLO, and JOSEPH GERARDI, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1343 and 1346.

6.    It was a part and an object of the conspiracy that JOSEPH PERCOCO, a/k/a "Herb," PETER GALBRAITH KELLY, JR., a/k/a "Braith," STEVEN AIELLO, and JOSEPH GERARDI, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to PERCOCO's honest services as a senior official in the Office of the Governor, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, PERCOCO, while serving as Executive Deputy Secretary to the Governor, would and did take official action in return for bribes paid, at the direction of KELLY, AIELLO, and GERARDI, by the Energy Company and the Syracuse Developer.

(Title 18, United States Code, Section 1349.)

3

## COUNT FIVE

(Solicitation of Bribes and Gratuities - The Energy Company)

7.    From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York and elsewhere, JOSEPH PERCOCO, a/k/a "Herb," the defendant, being an agent of a State government, to wit, a senior official in the Office of the Governor, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such government and agency involving a thing of value of $5,000 and more, while such government and agency was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, PERCOCO, in his capacity as a senior official in the Office of the Governor, solicited and accepted cash and things of value from the Energy Company intending for PERCOCO to be influenced and rewarded.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

## COUNT SIX

(Solicitation of Bribes and Gratuities - The Syracuse Developer)

8.    From at least in or about 2014, up to and including in or about 2015, in the Southern District of New York and elsewhere, JOSEPH PERCOCO, a/k/a "Herb," the defendant, being an agent of a State government, to wit, a senior official in the Office of the Governor, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such government and agency involving a thing of value of $5,000 and more, while such government and agency was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, PERCOCO, in his capacity as a senior official in the Office of the Governor, solicited and accepted cash and things

4

of value from the Syracuse Developer intending for PERCOCO to be influenced and rewarded.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

## COUNT SEVEN

(Payments of Bribes and Gratuities – The Energy Company)

9.    From at least in or about 2012 to at least in or about 2016, in the Southern District of New York and elsewhere, PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, who was an executive at the Energy Company, willfully and knowingly did corruptly give, offer, and agree to give a thing of value to a person, with intent to influence an agent of an organization of a State government, and an agency thereof, in connection with business, transactions, and series of transactions of such organization, government, and agency involving a thing of value of $5,000 and more, while such government and agency was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, KELLY offered and gave bribes to JOSEPH PERCOCO, a/k/a "Herb," the defendant, in order for PERCOCO to influence regulatory approvals and funding related to the development of a power plant in Orange County, New York, and take other official action to benefit the Energy Company.

(Title 18, United States Code, Sections 666(a)(2) and 2.)

## COUNT EIGHT

(Payments of Bribes and Gratuities – The Syracuse Developer)

10.    From at least in or about 2014 to at least in or about 2015, in the Southern District of New York and elsewhere, STEVEN AIELLO and JOSEPH GERARDI, the defendants, who were executives at the Syracuse Developer, willfully and knowingly did corruptly give, offer, and agree to give a thing of value to a person, with intent to influence an agent of an organization of a State government, and an agency thereof, in connection with business, transactions, and series of transactions of such organization, government, and agency involving a thing of value of $5,000 and more, while such government and agency was in receipt of, in any one year period, benefits in

excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, AIELLO and GERARDI offered and gave bribes to JOSEPH PERCOCO, a/k/a "Herb," the defendant, in order for PERCOCO to promote the Syracuse Developer's development projects in the State and take other official action to benefit the Syracuse Developer.

(Title 18, United States Code, Sections 666(a)(2) and 2.)

## COUNT NINE

(Wire Fraud Conspiracy – The Preferred Developer RFPs)

11.   From at least in or about 2013, up to and including in or about 2015, in the Southern District of New York and elsewhere, ALAIN KALOYEROS, a/k/a "Dr. K," STEVEN AIELLO, JOSEPH GERARDI, LOUIS CIMINELLI, MICHAEL LAIPPLE, and KEVIN SCHULER, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud in violation of Section 1343 of Title 18, United States Code.

12.   It was a part and an object of the conspiracy that ALAIN KALOYEROS, a/k/a "Dr. K," STEVEN AIELLO, JOSEPH GERARDI, LOUIS CIMINELLI, MICHAEL LAIPPLE, and KEVIN SCHULER, the defendants, and others known and unknown, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, KALOYEROS, AIELLO, GERARDI, CIMINELLI, LAIPPLE, and SCHULER, and their co-conspirators, devised a scheme to defraud Fort Schuyler Management Corporation ("Fort Schuyler"), a State-funded entity charged with awarding significant taxpayer-funded development contracts, by representing to Fort Schuyler that the bidding process for those contracts was fair, open, and competitive, when, in truth and in fact, they secretly tailored the requests for proposals ("RFPs") for those contracts so that companies that were owned,

controlled, and managed by AIELLO, GERARDI, CIMINELLI, LAIPPLE, and SCHULER were guaranteed to win the contracts.

(Title 18, United States Code, Section 1349.)

## COUNT TEN

(Payments of Bribes and Gratuities - The Syracuse Developer RFP)

13.   From at least in or about 2013 to at least in or about 2015, in the Southern District of New York and elsewhere, STEVEN AIELLO and JOSEPH GERARDI, the defendants, willfully and knowingly did corruptly give, offer, and agree to give a thing of value to a person, with intent to influence an agent of an organization of a State government, and an agency thereof, in connection with business, transactions, and series of transactions of such organization, government, and agency involving a thing of value of $5,000 and more, while such government and agency was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, AIELLO and GERARDI offered and gave bribes and gratuities to a representative of a New York State university and foundation in order to obtain a development contract.

(Title 18, United States Code, Sections 666(a)(2) and 2.)

## COUNT ELEVEN

(Payments of Bribes and Gratuities - The Buffalo Developer RFP)

14.   From at least in or about 2013 to at least in or about 2015, in the Southern District of New York and elsewhere, LOUIS CIMINELLI, MICHAEL LAIPPLE, and KEVIN SCHULER, the defendants, willfully and knowingly did corruptly give, offer, and agree to give a thing of value to a person, with intent to influence an agent of an organization of a State government, and an agency thereof, in connection with business, transactions, and series of transactions of such organization, government, and agency involving a thing of value of $5,000 and more, while such government and agency was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, CIMINELLI,

7

LAIPPLE, and SCHULER offered and gave bribes and gratuities to a representative of a New York State university and foundation in order to obtain a development contract.

(Title 18, United States Code, Sections 666(a)(2) and 2.)

## COUNT TWELVE

### (False Statements to Federal Officers)

15.   On or about June 21, 2016, in the Southern District of New York and elsewhere, STEVEN AIELLO and JOSEPH GERARDI, the defendants, willfully and knowingly did make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive, legislative, and judicial branches of the Government of the United States, to wit, AIELLO and GERARDI, while meeting with federal agents and representatives of the United States Attorney's Office for the Southern District of New York, each made statements denying involvement in paying JOSEPH PERCOCO, a/k/a "Herb," the defendant, and in tailoring a request for proposal for the benefit of their company, when, in truth and in fact, AIELLO and GERARDI directed payments to PERCOCO and conspired to tailor a request for proposal for the benefit of their company.

(Title 18, United States Code, Section 1001(a)(2).)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

16.   I am a Criminal Investigator with the USAO, and I have been personally involved in the investigation of this matter, which has been handled by Special Agents of the Federal Bureau of Investigation, Buffalo Field Office ("FBI") and Criminal Investigators in the USAO. I have been employed by the USAO since 2015, prior to which I was a Revenue Agent with the Internal Revenue Service for more than twelve years.   I and other members of the investigative team have experience in fraud and political corruption investigations and techniques associated with such investigations, including executing search warrants, financial analysis, and working with informants.

17.   This affidavit is based in part upon my own observations, my conversations with other law enforcement agents and others, my

8

examination of documents and reports by others, my interviews of witnesses, and my training and experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of the investigation. Where the contents of documents, including emails, and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where specifically indicated otherwise. For ease of reference, I have included a table of contents below.

## TABLE OF CONTENTS

I.   OVERVIEW ................................................. 11
II.  RELEVANT INDIVIDUALS AND ENTITIES ....................... 12
     A.   New York State Government and the Office of the
          Governor ........................................... 12
     B.   CNSE and Fort Schuyler ............................. 13
     C.   JOSEPH PERCOCO ..................................... 14
     D.   ALAIN KALOYEROS .................................... 15
     E.   Todd Howe .......................................... 16
     F.   PETER GALBRAITH KELLY and the Energy Company ....... 17
     G.   STEVEN AIELLO, JOSEPH GERARDI, and the Syracuse
          Developer .......................................... 18
     H.   LOUIS CIMINELLI, MICHAEL LAIPPLE, KEVIN SCHULER, and
          the Buffalo Developer .............................. 19
III. THE PERCOCO BRIBERY SCHEME .............................. 20
     A.   The Energy Company Paid Bribes to PERCOCO in Exchange
          for Official Actions by PERCOCO .................... 20
          i.    State Action Was Critical to the Energy Company ..... 21
          ii.   KELLY Began Providing Personal Benefits to PERCOCO .. 23
          iii.  PERCOCO Sought to Have His Wife Hired by the Energy
                Company ...................................... 26
          iv.   KELLY Caused the Energy Company to Make Payments to
                PERCOCO's Wife ............................... 29
          v.    PERCOCO Failed to Disclose Payments from the Energy
                Company ...................................... 32
          vi.   PERCOCO Agreed to Take Official Action for the Energy
                Company ...................................... 33

vii. PERCOCO Helped the Energy Company Obtain the
     Reciprocity Agreement ................................ 34

viii. PERCOCO Took Official Action Regarding the PPA ...... 36

ix. PERCOCO Extorted KELLY for More Money After Learning
    that the Energy Company Would Not Receive the PPA ... 39

x. KELLY Stopped Payments to PERCOCO's Wife After It
   Became Apparent that the Energy Company Would Not
   Receive the PPA .................................... 42

B. The Syracuse Developer Paid Bribes to PERCOCO in
   Exchange for Official Action ......................... 43

   i. PERCOCO Solicited Bribe Payments from the Syracuse
      Developer ....................................... 44

   ii. The Syracuse Developer Wanted PERCOCO's Assistance
       with ESD ...................................... 47

   iii. The Syracuse Developer Paid PERCOCO Approximately
        $35,000 ...................................... 49

   iv. PERCOCO Pressured ESD to Reverse Its Decision on the
       Labor Peace Agreement ......................... 50

   v. PERCOCO Assisted the Syracuse Developer in Obtaining
      the Release of State Funds ..................... 53

   vi. PERCOCO Secured a Raise for AIELLO's Son ........... 56

IV. THE BUFFALO BILLION FRAUD AND BRIBERY SCHEME ............. 58

   A. KALOYEROS Hired Howe to Be an Agent and Representative
      of CNSE .......................................... 59

   B. Executives of the Syracuse Developer and Buffalo
      Developer Bribed Howe for His Assistance in Obtaining
      State Contracts .................................. 60

   C. Fort Schuyler Was Defrauded into Awarding State
      Development Contracts to the Syracuse Developer and the
      Buffalo Developer ................................ 64

      i. Fort Schuyler Issued RFPs for Preferred Developers for
         Syracuse and Buffalo ......................... 65

      ii. The Syracuse RFP Was Designed to Defraud Fort
          Schuyler ................................... 67

      iii. The Buffalo RFP Was Designed to Defraud Fort
           Schuyler .................................. 71

      iv. Fort Schuyler Awarded Contracts to the Syracuse
          Developer and Buffalo Developer ............ 76

V. FALSE STATEMENTS BY AIELLO AND GERARDI ................... 78

10

## I.   OVERVIEW

18.   The charges in this Complaint stem from two overlapping criminal schemes involving bribery, corruption, and fraud in the award of hundreds of millions of dollars in State contracts and other official State benefits.

19.   The first scheme (the "PERCOCO Bribery Scheme") involves efforts by JOSEPH PERCOCO, a/k/a "Herb," the defendant, who served as the Executive Deputy Secretary to the Governor of the State between in or about January 2012 and mid-2014, and again in or about 2015, to abuse his official position and extensive influence within the Executive Branch by seeking and accepting bribe payments from executives at companies that were seeking benefits and business from the State in exchange for use of PERCOCO's official authority and influence to benefit those companies.  In part to disguise the nature and source of the bribe payments, bribes to PERCOCO were funneled in certain instances through a third-party intermediary and in other instances through bank accounts and a shell company set up by Todd Howe ("Howe"), a consultant who had been retained by the bribe-paying companies to help them obtain official State favors, and who is now cooperating with the Government.

20.   More specifically, between 2012 and 2016, Howe arranged for more than $315,000 in bribe payments to JOSEPH PERCOCO, a/k/a "Herb," the defendant, and PERCOCO's wife, funded by two clients of Howe that were seeking substantial official State benefits at the time the payments were solicited and made:  an energy company (the "Energy Company") and a Syracuse-based real estate developer (the "Syracuse Developer").  PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, oversaw external affairs and government relations for the Energy Company.  KELLY arranged for PERCOCO and PERCOCO's wife to receive more than $287,000 in bribe payments from the Energy Company in exchange for PERCOCO's official assistance for the Energy Company on an as-needed basis, including helping the Energy Company obtain a State contract estimated to be worth $100 million, that would help finance a $900 million power plant in Wawayanda, New York, and assisting the Energy Company with obtaining millions of dollars in energy credits for a power plant it was building in New Jersey.  STEVEN AIELLO and JOSEPH GERARDI, the defendants, were the President and the General Counsel, respectively, of the Syracuse Developer.  AIELLO and GERARDI arranged for PERCOCO to receive approximately $35,000 in bribe payments in exchange for PERCOCO's official

11

assistance for the Syracuse Developer on an as-needed basis, including
assisting the Syracuse Developer in reversing a costly decision of
a State economic development agency, influencing the State to release
payments owed to the Syracuse Developer, and obtaining a raise for
AIELLO's son, a New York State employee who worked for PERCOCO.

21.   The second scheme (the "Buffalo Billion Fraud and Bribery
Scheme") involves bribery, corruption, and fraud in the award of
contracts under the Governor's "Buffalo Billion" initiative and
similar programs.  In that scheme, executives at two companies, one
of which was the Syracuse Developer, conspired with ALAIN KALOYEROS,
a/k/a "Dr. K," the defendant, and Howe to deceive Fort Schuyler, a
State-funded entity charged with awarding State contracts worth
hundreds of millions of dollars, by secretly rigging the bidding
process so that the contracts would be awarded to those two companies.

22.   More specifically, ALAIN KALOYEROS, a/k/a "Dr. K," the
defendant, who oversaw the application process for many of the State
grants awarded under the Buffalo Billion and similar programs,
retained Howe to assist with developing the projects and identifying
developers for those projects.  Howe in turn solicited and received
bribe and gratuity payments from (a) the Syracuse Developer, run by,
among others, STEVEN AIELLO and JOSEPH GERARDI, the defendants, who
were seeking State development grants for projects in Syracuse, New
York, and (b) a Buffalo-based developer (the "Buffalo Developer"),
run by, among others, LOUIS CIMINELLI, MICHAEL LAIPPLE, and KEVIN
SCHULER, the defendants, that was seeking State development grants
for projects in Buffalo, New York.  In exchange for the bribe payments
to Howe, Howe worked with KALOYEROS to deceive Fort Schuyler by
secretly tailoring the required qualifications for those development
deals so that the Syracuse Developer and the Buffalo Developer would
be awarded the contracts, in Syracuse and Buffalo respectively,
without any meaningful competition.

## II.   RELEVANT INDIVIDUALS AND ENTITIES

### A. *New York State Government and the Office of the Governor*

23.   According to public sources and information provided by
the Governor's Office, I know the following: the State's executive
branch is headed by the Governor, who serves as the State's chief
executive, managing various State agencies, including those charged
with overseeing economic development, environmental conservation,

12

transportation and energy.   The Governor's closest advisors and aides
are referred to as working in the "Executive Chamber."   The Executive
Chamber includes the following officials, among others:  Executive
Deputy Secretary, which is the position that was held by JOSEPH
PERCOCO, a/k/a "Herb," the defendant, as described below; Secretary
to the Governor; and Director of State Operations.   The Secretary to
the Governor is in charge of the Executive Chamber's overall
management.   The Director of State Operations oversees the day-to-day
functioning of State government, including overseeing and providing
direction to many of the State agencies.   Within the Executive Chamber
there are also various Deputy and Assistant Secretaries organized
by subject area, who are the primary liaisons with their respective
State agencies, and report up to the Director of State Operations.

24.   I know from publicly available federal and State government
documents and public reports that, in each year relevant to this
Complaint, the government of the State received funds from the federal
government in excess of $10,000 per year.

## B. *CNSE and Fort Schuyler*

25.   Based on public information and interviews with, among
others, individuals associated with the College of Nanoscale Science
and Engineering ("CNSE") and its affiliated entities, I learned the
following:

a.   CNSE is a public institution of higher education that
is funded in part by the State.   In or around September 2014, CNSE
merged with the State University of New York Institute of Technology
to become a new public university known as the SUNY Polytechnic
Institute ("SUNY Poly"), of which CNSE is now a part.   Because CNSE
became part of SUNY Poly during the time period relevant to this
Complaint, unless otherwise specified, I refer to both CNSE and SUNY
Poly as "CNSE" in this Complaint. SUNY Poly is part of the State
University of New York, which is a public, State-supported
organization.

b.   The head of CNSE and SUNY Poly at all times relevant
to this Complaint was ALAIN KALOYEROS, a/k/a "Dr. K," the defendant.
Under his leadership, CNSE, and later SUNY Poly, focused on
developing partnerships with private companies to create large
development and construction projects.   When the Governor's Buffalo
Billion initiative was announced in 2012, CNSE created projects in

13

Buffalo and Syracuse, New York, in order to take advantage of new
State funds committed to development in upstate New York.

      c.   In or around 2009, CNSE created Fort Schuyler as an
affiliated non-profit real estate corporation to partner with
private companies on CNSE's behalf to carry out its development
projects.   As relevant here, Fort Schuyler manages development and
construction projects associated with CNSE in Buffalo and Syracuse,
New York.   Fort Schuyler is governed by a Board of Directors, which,
among other things, is charged with selecting private companies to
partner with Fort Schuyler in CNSE-related development projects,
including Buffalo Billion-related projects in Buffalo and similar
development projects in Syracuse, among other places.   Certain
public funding for CNSE goes through the Research Foundation for the
State University of New York (the "Research Foundation"), which
employed many individuals associated with CNSE and Fort Schuyler,
including ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, and Howe
(as a retained consultant), during the times relevant to this
Complaint.   During each year relevant to this Complaint, the Research
Foundation received more than $10,000 in federal funding.

### C. JOSEPH PERCOCO

    26.   Based on my review of documents both publicly available
and obtained during this investigation, including electronic
communications to and from JOSEPH PERCOCO, a/k/a "Herb," the
defendant, and my interviews with Howe as well as several individuals
who worked at the Governor's Office at the relevant times, I learned
that:

      a.   In or around 1992, PERCOCO joined the Office of the
then-Governor of New York (the "Former Governor") as an intern.
PERCOCO later worked for the current Governor (the son of the Former
Governor) when the Governor was Attorney General.   In or about January
2011, PERCOCO was appointed to be the Executive Deputy Secretary to
the Governor, and remained one of the Governor's closest advisors
during the Governor's first and second terms.   The position of
Executive Deputy Secretary is a high-ranking, senior, and influential
part of the Governor's Executive staff.   PERCOCO was generally seen
as the Governor's "right-hand man," who coordinated access to the
Governor and often spoke for him on a broad array of substantive and
administrative matters. PERCOCO's role included serving as a primary
"gatekeeper" of opportunities to speak or meet with the Governor,

14

overseeing logistics of the Governor's events and travel, supervising
appointments and administrative matters for the Executive Chamber,
and playing the principal role in organizing support for the
Governor's initiatives among lawmakers, labor leaders, and other
constituencies.  During all times relevant to this Complaint,
PERCOCO's primary work location was in Manhattan, New York, although
he typically traveled to Albany, New York approximately several times
per month and was an almost constant presence with the Governor during
his official duties.  PERCOCO also maintained a very close, personal
relationship with the Governor and the Former Governor, exhibited
by the Governor's public reference to PERCOCO as the Former Governor's
"third son."

        b.    On or about April 21, 2014, PERCOCO officially left
New York State employment to serve as campaign manager for the
Governor's reelection campaign, and returned to State service on or
about December 8, 2014.  PERCOCO permanently left his position as
Executive Deputy Secretary in or about January 2016, and is currently
an executive in the private sector.

        c.    According to multiple witnesses interviewed in this
investigation, as well as PERCOCO's email communications at the
relevant time, although PERCOCO was not on the State payroll between
at least on or about April 22, 2014 and December 7, 2014, while he
was the manager of the Governor's reelection campaign, PERCOCO
nevertheless continued to function in a senior advisory and
supervisory role with regard to the Governor's Office during that
time period, and continued to be involved in the hiring of staff and
the coordination of the Governor's official events and priorities,
among other things, and to travel with the Governor on official
business.  In addition, PERCOCO represented to others that he
intended to return to State service, including by stating on a mortgage
application submitted on or about August 7, 2014, that he was
"guaranteed a position with [the Governor] after the November
election."

### D. ALAIN KALOYEROS

        27.   I have learned from emails, financial records, publicly
available information, and witness interviews, including interviews
with Howe and executives of CNSE and its affiliated entities, that:

15

a.   ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, currently serves as the President of SUNY Poly.  Prior to CNSE's merger into SUNY Poly, KALOYEROS served as Senior Vice President and Chief Executive Officer of CNSE.

b.   At all relevant times, KALOYEROS served as a member of the Board of Directors of Fort Schuyler.  Fort Schuyler's officers also were hired by KALOYEROS and relied on staffing from the Research Foundation, and KALOYEROS supervised and controlled Fort Schuyler's day-to-day operations.

### E. *Todd Howe*

28.   I know from witness interviews, including interviews with Howe, and the review of emails, financial records and publicly available information that:

a.   Howe has held several public positions, including as a strategic advisor to the Governor when the Governor was United States Secretary of Housing and Urban Development, and as a senior aide to the Former Governor when the Former Governor was Governor of New York. I also know that Howe has known JOSEPH PERCOCO, a/k/a "Herb," the defendant, since PERCOCO was a college student, when Howe hired PERCOCO to work for the Former Governor.

b.   During all times relevant to this Complaint, Howe was the president and primary employee of a government relations and lobbying firm (the "Government Relations Firm") located in Washington, DC, that was a subsidiary of a law firm located in Albany, New York (the "Law Firm").  The co-chair of the Law Firm controlled the finances of the Government Relations Firm, including Howe's salary and bonuses, and approved all retention agreements for new clients of the Government Relations Firm.  Also during all times relevant to this Complaint, Howe was retained by several clients, most, if not all, of which retained Howe for his contacts with State officials, and for which Howe provided assistance with obtaining or facilitating business before the State.  Howe's clients included the Energy Company, the Syracuse Developer, and the Buffalo Developer.

c.   During all times relevant to this Complaint, Howe was also retained as a consultant to CNSE.  In his role as a consultant for CNSE, Howe maintained an office and parking space at CNSE, served

16

as a close advisor to ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, acted as an agent of CNSE with respect to, among other things, CNSE's development projects, including large, state-funded development projects in Syracuse and Buffalo, New York, and served as CNSE's primary liaison to the Governor and the Governor's senior staff.

      d.   In or around June 2016, Howe began meeting with the Government and cooperating with the Government's investigation.  In those meetings, Howe admitted to his role in the illegal schemes set forth herein as well as other crimes.  In or about September 2016, Howe pleaded guilty pursuant to a cooperation agreement with the Government to several federal crimes, including conspiracies to commit honest services fraud, extortion under color of official right, bribery, and wire fraud, substantive extortion and wire fraud offenses, and tax fraud.  The information provided by Howe has been corroborated by contemporaneous documents, including emails, and by the statements of other witnesses.

### F. *PETER GALBRAITH KELLY and the Energy Company*

      29.   I have learned from my review of emails, financial records, publicly available information, and witness interviews, including interviews with Howe and with employees of the Energy Company, that:

      a.   The Energy Company is a privately-owned electric power generation development and asset management company that, according to its website, focuses on a clean energy strategy utilizing natural gas and wind-powered generation.  Since in or about 2008, the Energy Company has been working to develop a $900 million power plant (the "Power Plant") in Wawayanda, New York, currently under construction.  As set forth in more detail below, the development process for the Power Plant involved numerous State approvals.

      b.   Since in or about 2008, PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, has been the Senior Vice President of External Affairs at the Energy Company.  In that role, which he continues to hold, he oversees public relations and governmental affairs for the Energy Company, in particular as it relates to the building of new power plants across the United States.

17

G. *STEVEN AIELLO, JOSEPH GERARDI, and the Syracuse Developer*

30.   I have learned from emails, financial records, publicly available information, and witness interviews, including interviews with Howe, that:

a.   The Syracuse Developer is a large real estate development firm located in Syracuse, New York that, through various corporate affiliates, builds, owns, and manages real estate in and around New York State.  Prior to 2013, the Syracuse Developer's business focused primarily on private development opportunities, including strip malls and supermarkets.  Beginning in or about 2013, the Syracuse Developer began obtaining a significant portion of its business from State-funded construction contracts.  Specifically, in or around December 2013, the Syracuse Developer was awarded a contract with Fort Schuyler to serve as the preferred developer for projects of CNSE to be created in Syracuse, New York.  This award permitted the Syracuse Developer to be chosen for CNSE development projects of any size in or around Syracuse without further competitive bidding, and, indeed, shortly thereafter, the Syracuse Developer received a contract worth approximately $15 million to build a film studio in Syracuse, New York, associated with CNSE, and in or around October 2015, the Syracuse Developer received a contract worth approximately $90 million to build a manufacturing plant in Syracuse, New York, associated with CNSE.

b.   STEVEN AIELLO, the defendant, is a founder of the Syracuse Developer and has been its President since in or about 1998.  Among other responsibilities, AIELLO serves as the company's general manager, focusing on business development, negotiating real estate contracts and handling tenant negotiations.

c.   JOSEPH GERARDI, the defendant, is a founder of the Syracuse Developer and its General Counsel since in or about 1998.  Among other responsibilities, GERARDI is responsible for, among other things, public permitting and negotiating company contracts.

18

in or around the spring of 2015, it had become clear to PETER GALBRAITH
KELLY, JR., a/k/a "Braith," the defendant, that the Energy Company
likely would not be getting the PPA, and the Energy Company's need
for the PPA had lessened because the Energy Company had obtained at
least some private funding for the construction of the Power Plant.
In or around June 2015, the Energy Company stopped paying the monthly
retainer for Howe that it had been paying to Howe's LLC, and Howe
reached out to KELLY by email to try to get paid. Based on the
interview of the External Affairs Manager, I learned that, in or around
August 2015, KELLY informed the External Affairs Manager that funding
for the wife of JOSEPH PERCOCO, a/k/a "Herb," the defendant, would
not be included in the Energy Company's budget for 2016. In an email
dated November 23, 2015, the External Affairs Manager discussed with
KELLY the new payment structure for teachers, a per diem of $250 per
day (far less than PERCOCO's wife was paid in the preceding years)
and noted that the External Affairs Manager wanted to hire a new
teacher. Based on my interview of the External Affairs Manager, I
understand that the new teacher was being hired to replace PERCOCO's
wife, and would be paid at the new per diem rate.

56.   Financial records reflect that the last payment from
Consultant-1 to the wife of JOSEPH PERCOCO, a/k/a "Herb," the
defendant, was on or about January 28, 2016.

## B. The Syracuse Developer Paid Bribes to PERCOCO in Exchange for Official Action

57.   As set forth in more detail below, even after JOSEPH
PERCOCO, a/k/a "Herb," the defendant, was able to get the Energy
Company to make payments to his wife in the amount of $7,500 per month,
PERCOCO remained in a difficult personal financial situation and tried
to address this by seeking additional money from Howe's clients who
had business before the State. Beginning in or around early 2014,
PERCOCO, through Howe, solicited bribe payments from the Syracuse
Developer. In response to these requests, in or around the spring
of 2014, PERCOCO, Howe, and two executives of the Syracuse Developer
-- President STEVEN AIELLO and General Counsel JOSEPH GERARDI, the
defendants -- entered into a bribery scheme whereby the Syracuse
Developer would make tens of thousands of dollars in payments to
PERCOCO, using Howe as a pass-through to help conceal that the payments
to PERCOCO came from the Syracuse Developer, and in exchange, PERCOCO
agreed to use, and did in fact use, his official position and influence
to assist the Syracuse Developer with a number of issues as the

opportunities arose.  Specifically, PERCOCO agreed to, and did, take
official action to (a) reverse the adverse decision by the Empire
State Development Corporation ("ESD"), which is the State's main
economic development agency, that would have required the Syracuse
Developer to enter into a costly labor peace agreement ("LPA"),
(b) free up a backlog of State funds that had already been awarded
to the Syracuse Developer but were delayed in payment, and (c) secure
an approximately $5,000 raise for AIELLO's son, who worked in the
Executive Chamber.

i.   **PERCOCO Solicited Bribe Payments from the Syracuse Developer**

58.  Based on my review of emails and my discussions with Howe,
I learned that, in or about January 2014, while still employed as
the Deputy Executive Secretary to the Governor, JOSEPH PERCOCO, a/k/a
"Herb," the defendant, began discussions with Howe about how PERCOCO
wanted to receive payments from the Syracuse Developer.  For example:

a.   On or about January 15, 2014, PERCOCO and Howe were
scheduled to meet with STEVEN AIELLO, the defendant, at the Governor's
Office in New York, New York.  Shortly before that meeting, Howe
emailed PERCOCO and advised PERCOCO to "Lay it on thick , govs loves
you [. . .] Lay it on heAvy Herbie!  Zitti herb!  Zitti!!"  PERCOCO
then responded, "I may pull gov and herbert in to say hello to him
if they are still here!"  Howe replied, "That would be great!  Worth
another crate of Zitti!"  Howe has explained that the "herbert"
referenced in PERCOCO's message was the Former State Operations
Director, and that PERCOCO was suggesting that he might have the
Governor and the Former State Operations Director greet AIELLO during
AIELLO's visit to the Governor's Office in order to be able to later
solicit "zitti" from the Syracuse Developer.  Howe has confirmed that
the meeting with AIELLO, the Governor, and the Former State Operations
Director took place, which is corroborated by records showing that
AIELLO did in fact visit the Governor's Office that day.

b.   In a subsequent email in the same chain described
above, which appears to have been sent prior to the meeting, Howe
wrote, in part, that Howe had suggested to AIELLO that PERCOCO might
eventually seek AIELLO's advice about the Syracuse region in
connection with the Governor's upcoming reelection campaign.
PERCOCO, however, responded, "only if that other thing happens!  I
will advise him on how to play a role and be relevant!"  Howe has

44

explained that the "other thing" referred to PERCOCO's expectation that he would receive payments from the Syracuse Developer.

59.   Based on my review of documents and emails and an interview with a former assistant counsel to the Governor (the "Assistant Counsel"), I know that in or around July 2014, before JOSEPH PERCOCO, a/k/a "Herb," the defendant, left the Executive Chamber to work as the Governor's campaign manager, PERCOCO sought an opinion from the Assistant Counsel about the possibility of PERCOCO working private sector jobs while he was employed as the Governor's campaign manager. Based on the interview with the Assistant Counsel and related documents, and the information uncovered in this investigation, I believe that PERCOCO provided false and misleading statements when he met with the Assistant Counsel and sought the Assistant Counsel's guidance.  For example, PERCOCO informed the Assistant Counsel that he planned to work at a law firm on issues related to labor organizations, and that he would work only on issues pending before municipal governments.  Percoco did not mention that he anticipated to work on issues related to New York State government when, in truth and in fact, and as set forth below, PERCOCO did not expect that his work would be strictly confined to issues pending before municipal governments.  Instead, at the time of this conversation, PERCOCO already was planning to receive payments from the Syracuse Developer, which, as he well knew, had substantial business before the State.

a.   On or about the same day of the meeting with PERCOCO, the Assistant Counsel wrote a memorandum, dated on or about July 9, 2014, with the subject line "Post-Employment Ethics Rules/Restrictions" (the "Employment Memorandum").  The Employment Memorandum addressed whether PERCOCO would be allowed under New York State law to work at a law firm on issues before municipal authorities. The Assistant Counsel wrote, in part, "Joseph Percoco has asked whether Public Officers Law (POL) § 74, subd. 8 impacts his post-State employment activities.  He has advised me that he has been asked by a law firm to engage in discussions with various labor organizations on local matters pending before local municipalities."  The Assistant Counsel concluded that, "In sum: there are no restrictions on his proposed activities.  The POL limits the actions of a covered State employee with respect to appearances or matters before State agencies; not local governmental entities."

b.   The Employment Memorandum expressly pointed out that

45

PERCOCO was barred by State law from working on issues pending before
State agencies or the Executive Chamber.  The Assistant Counsel wrote
that, for two years after leaving State service, "an Executive Chamber
employee is prohibited from receiving compensation for services
rendered in connection with <u>any matter before the Executive Chamber</u>
and is also prohibited <u>from appearing or practicing before the</u>
<u>Executive Chamber or any state agency</u>."  (Emphasis in original.)

     c.    The Assistant Counsel has explained that his advice
with respect to PERCOCO's post-State employment would have been
different if PERCOCO had proposed working on behalf of clients with
business before New York State government.  The Assistant Counsel
also stated that, following their early July 2014 meeting, PERCOCO
did not seek any additional advice or guidance from the Assistant
Counsel.

     d.    On or about July 10, 2014, PERCOCO forwarded the
Employment Memorandum to Howe.  In response, Howe wrote, "Herb Zitti
!! Very nice."[8]

    60.   Based on my review of emails and my discussions with Howe,
I know that, in and around this same time period, between June and
July 2014, JOSEPH PERCOCO, a/k/a "Herb," the defendant, sent a number
of increasingly aggressive emails to Howe requesting additional
monetary payments from Howe's clients.  Based on my review of bank
records and the FBI's financial analysis, I know that PERCOCO had

---

   [8] As described above, PETER GALBRAITH KELLY, JR., a/k/a "Braith,"
the defendant, told executives at the Energy Company on two separate
occasions that he had obtained a memo from the Governor's Office
approving the hiring of PERCOCO's wife.  Based on my review of
documents and interviews in this matter, the Employment Memorandum
cannot be the purported memo to which KELLY was referring.  First,
the Employment Memorandum was written more than a year after KELLY
first claimed he had seen such a memo and approximately one week after
KELLY, for a second time, claimed he had seen it.  Second, the
Employment Memorandum does not relate in any way to PERCOCO's wife's
employment, and it expressly prohibits PERCOCO from doing any work
on any matter pending before the Executive Chamber or any State agency.

an approximately $800,000 balloon payment due on his mortgage in or around July 2014.  Furthermore, PERCOCO indicated to Howe that he would not provide Howe's clients with his official assistance unless and until he received monetary payments.  For example:

        a.   On or about July 23, 2014, Howe forwarded PERCOCO an email from a client proposing a promotional opportunity for the administration and added, in part, "Herb – we should talk about this." PERCOCO replied, "ok. will deal with it after I get my ziti!"

        b.   Two days later, on or about July 25, 2014, Howe sent an email to PERCOCO related to the Energy Company in which Howe reported that "Braith Txd me to say [the Energy and Finance Chair] meeting went well.  Looks like a few more months of Zitti." PERCOCO replied, "I have no ziti herb. none. but . . . enjoy your vacation. I will send my kids in the backyard with the garden hose." Approximately two hours later, Howe asked PERCOCO to, among other things, speak with the Energy and Finance Chair about the Energy Company.  PERCOCO responded in part: "No. I cannot. I am barred from having those conversations." Howe has explained that PERCOCO had never previously refused to intervene with a State official on behalf of the Energy Company (once the Energy Company had begun paying PERCOCO's wife), and in fact had repeatedly done exactly that despite "being barred from having those conversations." Howe understood that PERCOCO's refusal to speak with the Energy and Finance Chair at this time was because PERCOCO was seeking additional money from other clients of Howe and had not yet received it.

## ii.   The Syracuse Developer Wanted PERCOCO's Assistance with ESD

    61.   Based on my review of emails, my discussions with Howe, and interviews with employees of ESD, I learned that, around this same time, in the summer of 2014, the Syracuse Developer was locked in a disagreement with ESD over whether, by law, one of the Syracuse Developer's construction projects in Syracuse required a costly labor peace agreement ("LPA") with organized labor.  Having failed to persuade ESD that its project did not need an LPA or to modify the project as suggested by ESD to avoid triggering the statutory LPA requirement, the Syracuse Developer repeatedly sought the assistance of JOSEPH PERCOCO, a/k/a "Herb," the defendant, to avoid the LPA requirement.

47

a.    The issue first arose in or around early summer 2014. At that time, the Syracuse Developer was constructing a parking lot (the "Parking Lot") in Syracuse. ESD had awarded more than approximately $1.5 million to the Syracuse Developer for this project. On or about June 27, 2014, JOSEPH GERARDI, the defendant, informed ESD that a portion of the Parking Lot would service, among other things, a neighboring hotel and a future hotel that had not yet been built.

b.    On or about July 7, 2014, a Syracuse-based employee of ESD ("ESD Employee-1") emailed GERARDI and explained that "ESD legal counsel has reviewed the information you have provided" and "has determined that" because the Parking Lot will directly service a hotel, "ESD funding for this project will trigger the requirement for the Labor Peace Agreement (LPA) we previously discussed." ESD Employee-1 instructed the Syracuse Developer to "please contact the appropriate local labor organization and negotiate an LPA at your earliest convenience." From speaking with Howe and employees of ESD, I learned that certain State-funded construction projects that involve or relate to hotels require an LPA between the developer and the relevant hotel workers' unions, which would have significantly increased the cost of the Parking Lot.

62.   Based on my review of emails and interviews of, among others, Howe, I learned that STEVEN AIELLO and JOSEPH GERARDI, the defendants, were concerned that the need to obtain a LPA would delay construction of the Parking Lot or would compel the Syracuse Developer to forgo ESD funding. AIELLO and GERARDI characterized their disagreement over the need for a LPA as "time sensitive." In or around late July 2014, having failed to persuade ESD to change its mind on their own, AIELLO and GERARDI asked Howe to secure the help of JOSEPH PERCOCO, a/k/a "Herb," the defendant, in reversing ESD's decision that an LPA was necessary.

a.    On or about July 30, 2014, AIELLO emailed Howe and asked, in part, "is there any way Joe P can help us with this issue while he is off the 2nd floor working on the Campaign. We can't seem to put it behind us. I think Labor keeps drumming up their interpretation , to force us to sign with them. I could really use an advocate with regard to labor issues over the next few months."

b.    The following day, on or about July 31, 2014, the head

of a regional body of a national labor union ("Labor Leader-1") wrote an email to AIELLO stating, in part, "Attached is a copy of the 'Labor Peace Agreement' that we spoke about at our meeting earlier this month. [. . .] I look forward to getting the Labor Peace Agreement finalized and signed." A few hours later, AIELLO forwarded this email to Howe and wrote, "Todd, can call Joe P. Need help on this. Thanks."

iii.    **The Syracuse Developer Paid PERCOCO Approximately $35,000**

63. Based on my review of emails and my discussions with Howe, I believe that, less than two weeks after STEVEN AIELLO and JOSEPH GERARDI, the defendants, sought the help of JOSEPH PERCOCO, a/k/a "Herb," the defendant, with respect to the LPA, PERCOCO, AIELLO, GERARDI, and Howe reached an agreement whereby the Syracuse Developer would pay PERCOCO approximately $35,000 in return for PERCOCO's use of his official influence to help the company, including with regard to the company's issues with ESD. The Syracuse Developer's payments to PERCOCO would be run through Howe, who acted as a pass through in order to disguise the source of the payments. Evidence of the disguised payments to PERCOCO include, among other things, the following:

a.    Based on my discussions with Howe, I learned that after AIELLO and GERARDI agreed to make payments to PERCOCO, AIELLO and Howe decided that the payments would be made through Howe's LLC (*i.e.*, the shell company Howe originally set up, in coordination with PETER GALBRAITH KELLY, JR. a/k/a "Braith," the defendant, to receive additional payments from the Energy Company) in order to mask the source of the payments, because AIELLO and Howe were concerned about the optics of paying PERCOCO while the Syracuse Developer had business and procurement contracts before the State. Accordingly, and as reflected in financial records I have reviewed, the Syracuse Developer paid PERCOCO by writing checks to Howe's LLC; and Howe then wrote checks in the same amount from Howe's LLC to PERCOCO's wife, to further disguise the source and nature of the payments.

b.    The Syracuse Developer's first payment to PERCOCO was made in August 2014. On or about August 11, 2014, Howe sent an invoice for approximately $15,000 from Howe's LLC to AIELLO. Howe wrote in the accompanying email, "Steve – per our discussion. Attached is the Labor Relations Invoice for June, July & August 2014. Thank you." According to the invoice, Howe's LLC sought payment for "NYS

49

Consultation / Labor Strategy-Relations / Labor Financing" work
covering the "June-July-August, 2014" time period. Howe has
explained that the invoice in fact sought payment for PERCOCO,
ostensibly for PERCOCO's work for the Syracuse Developer even though
PERCOCO had not yet performed any work on behalf of the company.

    c.    In or around mid-August 2014, the Syracuse Developer
paid by check $15,000 to Howe's LLC.  In turn, Howe wrote a check for
the same amount to PERCOCO's wife, which was later deposited into
the PERCOCOs' joint bank account.

    d.    A second payment from the Syracuse Developer to
PERCOCO, in the amount of $20,000, was made in or around October 2014.
As with the August 2014 payment, the Syracuse Developer paid by check
$20,000 to Howe's LLC.  Howe then sent a check for the same amount
to PERCOCO's wife, which was subsequently deposited into the PERCOCOs'
joint bank account using an automated teller machine ("ATM") located
in Westchester County, New York.[9]

## iv.    PERCOCO Pressured ESD to Reverse Its Decision on the Labor Peace Agreement

    64.    As set forth in more detail below, I believe, based on my
review of emails and my discussions with Howe, that, in exchange for
the $35,000 in payments from the Syracuse Developer, JOSEPH PERCOCO,
a/k/a "Herb," the defendant, agreed to use, and did in fact use, his
official position and influence to benefit the Syracuse Developer
on at least three occasions as those opportunities arose.  PERCOCO
agreed to use, and did in fact, use his influence to cause ESD to

---

[9] As set forth above in paragraph 45, PERCOCO completed the
Disclosure Form for the year 2014 in or around May 2015.  Despite prior
efforts to mask the payments from the Syracuse Developer by running
the payments through Howe's shell company (i.e., Howe's LLC), PERCOCO
ultimately represented that he earned consulting fees totaling
approximately $50,000 to $75,000 from the Syracuse Developer on the
Disclosure Form.  Pursuant to State law, the disclosure forms of State
employees, including PERCOCO's, are not made available to the public
unless sought through a State Freedom of Information Law request.

reverse its decision that the Parking Lot required a costly LPA.  The evidence showing PERCOCO's agreement to use, and his actual use, of his influence on that issue includes, among other things, the following:

a.   On or about August 22, 2014, JOSEPH GERARDI, the defendant, emailed Howe and copied STEVEN AIELLO, the defendant. GERARDI wrote, in part, "I wanted to follow up on ESD's position that we are required to enter into a LPA, in order to be able to utilize ESD funds [. . .] to construct a parking lot and infrastructure along the eastern shore of the Inner Harbor development." GERARDI continued, in part, "Steve and I wondered whether it would be appropriate at this time to engage our labor consultant, to try to resolve this matter, given that we would like to start construction this fall, but will not be able to proceed if an LPA is required." Howe has explained that GERARDI's reference to "our labor consultant" referred to PERCOCO, who at this time had already been paid $15,000 by the Syracuse Developer.

b.   On or about August 28, 2014, Howe sent an email to PERCOCO and wrote, in part: "Will provide you with [Labor Leader-1]'s number tomorrow, you need to call her let her know you don't see an issue (as she agrees) with the need for a Laboe [sic] Peace Agreement for the [Syracuse Developer] INter [sic] Harbor Hotel parking lot project. [. . .]  Then after you hear from her that she's ok with it, let [the Deputy State Operations Director] know so he can get the damn ESD lawyer to drop it, as no one sees it as an issue other than our own lawyer!"  From speaking with Howe and employees of ESD, I know that the Deputy State Operations Director was the Executive Chamber official responsible for development policies and therefore had significant interaction with, as well as influence over, officials at ESD.

c.   Also on or about August 28, 2014, Howe sent an email to AIELLO and copied PERCOCO.  Howe wrote, "Steve - email Joseph, [Labor Leader-1's] number and he said he'd call her per our discussion tonight regarding the need to have a Labor Peace Agreement for the parking lot of the Inner Harbor Hotel.  Joe understands the message that needs to be delivered and understands that [Labor Leader-1] agrees with us, that there is no need for one given the lot is primarily for the general public."

d.    In or about November 2014 -- after the Syracuse
Developer had paid PERCOCO a total of $35,000 -- AIELLO and GERARDI
again sought PERCOCO's assistance in attempting to change ESD's
decision requiring the LPA for the Parking Lot.  On or about November
19, 2014, GERARDI wrote an email to PERCOCO, copying AIELLO and Howe,
that explained the Syracuse Developer's unhappiness and disagreement
with ESD's requirement of an LPA.  The email began, "Hello Joe, [.
. .]  According to [ESD Employee-2], the local ESD Regional Director,
ESD NYC Counsel has determined that our 'project' will trigger the
requirement for a LPA."

e.    On or about December 1, 2014, ESD Employee-2 emailed
GERARDI to schedule time to discuss the LPA and "get this issue
resolved."  GERARDI then forwarded that email on or about December
3, 2014 to Howe, copying AIELLO, and wrote, in part, "Anything with
JP on this.  [ESD Employee-2] is pressing to 'resolve' this issue .
. . . . and we don't want to be in jeopardy of losing the ESD funding
. . . . . sorry to be a pest."

i.    Howe, in turn, forwarded the email to PERCOCO
with the message "???"  PERCOCO responded to Howe and wrote "stand
by."  By this time, the Governor had been reelected and PERCOCO was
less than a week away from returning to his former State position.

ii.    Approximately ten minutes later, Howe wrote back
to GERARDI and AIELLO: "Just hung up with JP.  [ESD Employee-2] is
being informed as I type this that ESD HQ in NYC does NOT concur with
his read on this . . . . . JP said we should stand by and let message
sink in over next several hours and then look for ESD to reach back
out to you, with a 'different' perspective."  Soon thereafter, Howe
sent another reply stating, in part, "JP just called me back to say
[ESD Employee-2] should be reaching out to you.  Let me know when you
do and I'll close loop with JP."

iii.    The next day, on or about December 4, 2014,
GERARDI wrote an email informing Howe that ESD Employee-2 called and
stated that ESD had changed its position on the need for an LPA.
GERARDI reported, in part, "I wanted to let you know that I spoke
with [ESD Employee-2] this morning and he advised that they have
convinced ESD that the hospitality portion of the Syracuse Inner
Harbor development is relatively minor.  Therefore, the ESD funds
awarded can be used to build the parking lot and infrastructure

52

contemplated without the need for a LPA. [. . .] Thank you and JP for your efforts!" AIELLO responded, "They convinced ESD? Laughable!" Howe then replied, "Amazing how [ESD Employee-2] re-writes history!"

   f. Based on my discussions with Howe and interviews with employees of ESD, I learned that the Syracuse Developer in fact was not required to obtain an LPA for the Parking Lot and was allowed to use ESD funds for the project.

**v. PERCOCO Assisted the Syracuse Developer in Obtaining the Release of State Funds**

   65. I also believe, based on my review of emails and my discussions with Howe, that, in exchange for the $35,000 he was paid by the Syracuse Developer, JOSEPH PERCOCO, a/k/a "Herb," the defendant, also agreed to use, and did in fact, use his official position and influence on a second State matter of concern to the Syracuse Developer: the release of more than $14 million in State funds that had previously been awarded to the Syracuse Developer but had not yet been paid out due to backlogs at certain State agencies. The evidence showing PERCOCO's use of his official position and influence on this issue includes, among other things, the following:

   a. In or around mid-2015, the State had not yet released significant blocks of funds to the Syracuse Developer for the construction of certain CNSE projects that had previously been awarded to the Syracuse Developer. As set forth in more detail below, in or around the end of 2013, CNSE chose the Syracuse Developer as its preferred developer in the Syracuse area and subsequently awarded the Syracuse Developer two major construction projects, specifically, an approximately $90 million manufacturing plant and an approximately $15 million film hub (the "Film Hub"). By in or around August 2015, the Syracuse Developer complained that approximately $14.2 million in State payments were either past due or about to come due on the two projects. Pressured by subcontractors and vendors that were threatening to stop working unless they were paid, STEVEN AIELLO, the defendant, and Howe asked PERCOCO, who had returned to his position as Executive Deputy Secretary, to intervene and help secure the release of those payments.

   b. On or about August 31, 2015, AIELLO notified Howe and an employee of CNSE about a "vendor demanding payment" in connection

with the manufacturing plant. AIELLO wrote: "Help!! It's mounting!"
Howe forwarded AIELLO's email to PERCOCO and asked him to attend a
conference call with Howe, AIELLO, GERARDI, an employee of CNSE, and
an employee at the Dormitory Authority of the State of New York
("DASNY"), which is responsible for facilities financing and
construction. As Howe explained in the email, the purpose of the call
was "to go over these asap this week if your schedule permits? As
we discussed, [the Syracuse Developer] is getting hit left and right
by vendors who are threatening to walk off the job . . . etc." PERCOCO
responded, "ok. let me find out who is the right person to talk to
at dasny. thanks."

        c.     Based on emails sent and received from PERCOCO's
personal email account, I believe that within a day of the above
exchange with AIELLO, PERCOCO had determined that the State Division
of the Budget ("DOB") was the source of the delay in releasing the
State funds to the Syracuse Developer, and that PERCOCO would meet
with the DOB himself to try to resolve the issue. In an email sent
on or about September 1, 2015, PERCOCO told Howe to "do a mtg on this
tomorrow with budget folks which is where I am told this is stuck.
thanks." Howe responded and asked PERCOCO to "do call with us?? They
aren't going to listen to us." PERCOCO, however, responded, "you
misunderstood me. I am doing the mtg with budget. as of now I dont
need your guys on the call."

        d.     On or about September 3, 2015, Howe asked PERCOCO,
"how did you make out with Budget on [the Syracuse Developer]. Out
here in Syracuse and Steve is having a heart attack? Do you need a
call with the [CNSE] folks to get budget anything?" PERCOCO replied,
"No. Sit tight. Mtg is today."

        e.     The next day, on or about September 4, 2015, Howe
emailed PERCOCO again to ask, in part, for "an update on the DOB meeting
yesterday." PERCOCO responded, "There are some checks that are being
freed up from the slow process next week. I am getting the exact list
as we speak."

        f.     On or about September 9, 2015, the Deputy State
Operations Director wrote to an employee of the DOB ("DOB Employee-1")
and asked about the "timeframe" of the first significant disbursements
for the Film Hub. Later the same day, DOB Employee-1 replied, in part,
"$1.184m: Should happen within a week or so, depending on DASNY and
SUNY Poly's responsiveness. DOB has allocated the funds. We're

54

checking with DASNY on [grant disbursement agreement] status, information outstanding from SUNY Poly and anything else needed for payment." (Emphasis in original.)  Based on my review of emails and publicly available sources, I learned that, after the DOB made the Film Hub funds available, DASNY had to complete its own approval process and then enter into a grant disbursement agreement with Fort Schuyler, which, in turn, would provide the Film Hub funds to the Syracuse Developer.

       g.    Based on my review of emails, I know that, in or around the second of half of September 2015, DASNY requested certain additional documents from Fort Schuyler and the Syracuse Developer related to the Film Hub funds.

       h.    On or about September 30, 2015, Howe forwarded a text message from AIELLO in which AIELLO expressed disappointment that he had not been invited to the events surrounding the Governor's visit to Syracuse that was scheduled to take place later that day.  In a follow-up email to PERCOCO and the Deputy State Operations Director that day, Howe wrote, in part, "Today is just another nail in Steve"s [sic] back, he wasn't even invited to attend.  We need to put ourselves in his position.  He built one building on time and completed it and can't get final payment and he's half way done on a second building and hasn't gotten paid a penny, we constantly ask him to help us. . . .  It's not a good situation.  It's an issue of managing our friends.  We just can't abandon them when things get tough and I think that's what he is venting about."

       i.    In a reply soon thereafter, PERCOCO asked, in part, "agree with you todd about abandoning people. [Deputy State Operations Director] why didn't we invite steve?"

       ii.    Howe replied and wrote, in part, "Just need your help to get that funding moving the bureaucracy is killing them."

       iii.    PERCOCO responded to Howe's email and stated, in part, "I have done everything I can.  The small check should be breaking free [. . .] soon.  The problem is your client at nano.  You fix.  I am fucking pissed at nano and the team there. [. . .]  I need a mtg with you, alain and [the current Secretary to the Governor] asap!  I am fuckin pissed!!!!"  Based on my review of emails and my participation in this investigation, I know that the "client at nano" refers to CNSE, which, as set forth above, was a client of Howe and

has the nickname "Nano" and that "alain" refers to ALAIN KALOYEROS, a/k/a "Dr. K," the defendant.

       iv.    In a subsequent email in the same chain, also sent on or about September 30, 2015, the Deputy State Operations Director wrote, "I spoke to Steve directly. He will be at the site and have a few construction workers from the hotel ready to greet the gov at 115."

       v.    Howe replied, "Thank you. This eases the funding headache. Important that community see this project is still on Govs radar screen."

       vi.    I learned from reviewing emails and media reports that, later the same day, on or about September 30, 2015, the Governor toured a hotel located in the Syracuse Inner Harbor that was being constructed by the Syracuse Developer and met with, among others, AIELLO.

### vi.  PERCOCO Secured a Raise for AIELLO's Son

66.   I also believe, based on my review of emails and my discussions with Howe and State employees, that, in exchange for the $35,000 he was paid by the Syracuse Developer, JOSEPH PERCOCO, a/k/a "Herb," the defendant, agreed to use, and did in fact, use his official position and influence in a third way to benefit the Syracuse Developer: to secure a salary increase of approximately $5,000 for the son of STEVEN AIELLO, the defendant, ("AIELLO's Son") who worked in the Executive Chamber. The evidence showing PERCOCO's use of his official position and influence with respect to AIELLO's Son's salary includes, among other things, the following:

       a.    In or around July 2014, AIELLO's Son left his job at New York State Housing and Community Renewal ("HCR") to work on the Governor's reelection campaign as an assistant to PERCOCO. AIELLO's Son was not paid while working for the campaign. Following the election in November 2014, AIELLO's Son returned to HCR and then moved to a position in the Executive Chamber in or around September 2015. Between November 2014 and around August 2015, AIELLO's Son received two raises and a locality adjustment, increasing his salary approximately ten percent. From speaking with, among others, an employee of the Executive Chamber who managed a variety of human resources issues and reported directly to PERCOCO ("Chamber

Employee-1"), I learned that salary increases for Executive Chamber
employees are usually limited to no more than ten percent in a given
year.  Chamber Employee-1 could not recall any specific employee who
has received a salary increase of greater than ten percent.

      b.   Notwithstanding the ten percent increase in his son's
salary in less than a year, AIELLO sent an angry text message to Howe
on or about September 25, 2015 complaining about the modest size of
his son's most recent pay raise: "I just got a call from [my son],
he got his paperwork for his raise.  He went from 54 thousand a year
to 56 thousand!  We have waited patiently months for money for these
projects with [CNSE].  The administration has embarrassed me in my
community, as a slow pay.completely tarnished our reputation, we are
considered a slow pay.  [My son] bust his ass, loyal as the day is
long.  I have been loyal as the day is long.  They insult us like this.
I'm finished!!!  Everybody else gets what they need and want.  I keep
giving.  It's a sad statement!"  Howe forwarded AIELLO's text to
PERCOCO, and added: "I told Steve just now that I spoke to you and
you were going to address the salary issue today [. . .]  try to get
him to 65 k or above."  Howe then followed up later that same day,
and PERCOCO responded, "I am working on it herb!"[10]

      c.   Based on my review of emails, publicly available
documents, documents obtained in the course of this investigation,
and interviews of, among others, Howe and employees of the Executive
Chamber, I learned that, on or about September 25, 2015 -- the same
day that Howe passed along AIELLO's complaints to PERCOCO -- PERCOCO
sent an email to Chamber Employee-1 and three employees of the State
Office of General Services ("OGS"), which handles certain human
resources issues for the Executive Chamber.  PERCOCO asked: "What

---

   [10] This email echoed one from several months before.  On or about
May 27, 2015, Howe emailed PERCOCO and wrote, in part, "got a call
from Steve Sr.  Wanted to see if you could try and help jr. with that
salary issue we had talked about?"  Howe then specifically asked, "Is
it impossible for him to get a $10k bump? He's at 54 k now is it possible
to get him to 64k. ?"  At the time, PERCOCO had responded, in part:
"Tough do [sic] $10k bump.  Can do $6k now then the rest later after
session.  Concerned about optics."

happened with [AIELLO's Son's] raise when he was moved to policy team? I am told he never got it.  Also, we discussed moving him out of HCR?"

        i.    An employee of OGS ("OGS Employee-1") responded, "We moved him out of HCR.  Didn't know it was supposed to go with a bump.  10%?"

        ii.    PERCOCO replied, "This is another stupid blunder.  Another we had no idea.  BS.  I raised this months ago.  Now he is quitting because you guys cant get the simplest things executed. [Chamber Employee-1], you handle this.  I will call you."

        iii.    OGS Employee-1 informed PERCOCO that they would prepare a request for an additional ten percent salary increase; OGS then submitted the request to the DOB, which approved the raise on or about September 28, 2015.  From speaking with Chamber Employee-1 and two of the OGS employees copied on the above email, I learned that they had no recollection of PERCOCO being so involved in seeking the raise of any other Executive Chamber employee.

        d.    On or about September 25, 2015, approximately two hours after PERCOCO learned the salary increase request had been submitted to the DOB, PERCOCO emailed Howe and wrote, "[AIELLO's Son] issue resolved.  will take effect immediately.  spoke to him and all is good."  I know that, in fact, AIELLO's Son did receive a ten percent raise amounting to approximately $5,700 per year on or about October 1, 2015 that was made retroactive to on or about September 24, 2015. The raise pushed his total salary to approximately $65,000 per year.

## IV.   THE BUFFALO BILLION FRAUD AND BRIBERY SCHEME

    67.   The PERCOCO Bribery Scheme described above was not the first scheme involving bribery and unlawful access to State benefits in which the Syracuse Developer participated.  Rather, as described below, beginning in or around 2013, the Syracuse Developer and the Buffalo Developer conspired with Howe and ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, to defraud Fort Schuyler -- which was charged with awarding significant development contracts paid for with taxpayer dollars obtained from ESD -- into giving lucrative contracts to the Syracuse Developer and the Buffalo Developer.

68.   As part of this scheme, the Syracuse Developer and the
Buffalo Developer paid bribes to Howe, which were purported to be
"consultancy" payments and bonuses but which were in fact payments
for Howe's actions in his capacity as an agent and representative
of CNSE and the Research Foundation who had, along with ALAIN
KALOYEROS, a/k/a "Dr. K," the defendant, substantial control over
Fort Schuyler's State-funded development projects.  In exchange for
the payments to Howe, and as described more fully below, Howe worked
with KALOYEROS to defraud Fort Schuyler by secretly rigging the bids
for large development deals so that they went to the Syracuse Developer
and the Buffalo Developer, while falsely representing to Fort Schuyler
that the bidding process was fair, open, and competitive.   In
particular, as set forth below, (a) KALOYEROS caused Fort Schuyler
to issue purportedly competitive requests for proposal ("RFPs") for
companies to be named preferred developers for CNSE in Buffalo and
Syracuse, where CNSE intended to undertake significant development
projects paid for under the Buffalo Billion initiative and other state
development programs; (b) KALOYEROS and Howe secretly tailored the
RFPs so that the RFPs requested qualifications held by the Syracuse
Developer and the Buffalo Developer; and (c) Fort Schuyler's
evaluation committee and Board of Directors evaluated and voted on
the bids not knowing that KALOYEROS and Howe had prevented competing
bids and designed the requirements to fit the Syracuse Developer and
the Buffalo Developer.  For his part in the scheme, KALOYEROS was able
to maintain his leadership position and substantial salary at CNSE
and garner support from the Office of the Governor for projects
important to him, including the creation of SUNY Poly.

## A. *KALOYEROS Hired Howe to Be an Agent and Representative of CNSE*

69.   Based on my review of emails and interviews with, among
others, Howe, I learned that, in or around the fall of 2011, ALAIN
KALOYEROS, a/k/a "Dr. K," the defendant, contacted Howe for the
purpose of retaining Howe as a consultant for CNSE.  As set forth
above, Howe had close connections to the Office of the Governor, whose
support would be helpful with two goals of KALOYEROS: (i) the receipt
of State funding; and (ii) the merger of CNSE into SUNY Poly, which
KALOYEROS would found and lead.  Among other things, Howe understood
that KALOYEROS was concerned about his relationship with the Office
of the Governor and was worried that he might lose his leadership
position at CNSE.  According to public records, in 2011 KALOYEROS
was paid a salary of approximately $800,000 and received at least
$500,000 in additional compensation through grants and/or other

payments. KALOYEROS accordingly told Howe that he wanted to hire
Howe to help KALOYEROS maintain his position at CNSE/SUNY Poly,
assist CNSE in its relationship with the Office of the Governor, and
represent CNSE in its efforts to undertake large, State-sponsored
development projects.

70.   Based on my review of documents obtained from CNSE and the
Government Relations Firm and its associated Law Firm, and interviews
with, among others, Howe and individuals associated with CNSE and
Fort Schuyler, I learned that in or around 2012, ALAIN KALOYEROS,
a/k/a "Dr. K," the defendant, caused the Research Foundation to retain
Howe as a consultant for CNSE and Fort Schuyler, at a rate of $25,000
per month, which continued until at least in or about 2015. These
payments were made to the Law Firm. During the relevant time period,
Howe physically worked at CNSE approximately twice per week. Howe
had a parking space and an office at CNSE. Although the location of
the office changed from time to time, it was always near KALOYEROS's
office.

B. *Executives of the Syracuse Developer and Buffalo Developer Bribed
Howe for His Assistance in Obtaining State Contracts*

71.   Based on my review of emails, publicly available and other
documents, and interviews with, among others, Howe, I learned that
throughout 2013 and 2014, STEVEN AIELLO and JOSEPH GERARDI, the
defendants, caused the Syracuse Developer to pay Howe as a
"consultant" knowing that Howe was acting as an agent and
representative of CNSE and intending for him to use his official
position for their benefit, as set forth below.

a.   In or around November 2011, AIELLO, on behalf of the
Syracuse Developer, entered into an agreement with the Government
Relations Firm (which was run by Howe) under which Howe would serve
as a "consultant" (and not a lobbyist), and the Syracuse Developer
would pay the Government Relations Firm $6,500 per month. The
following year, the Syracuse Developer expanded its relationship with
Howe, agreeing to pay an additional $7,500 per month, for a total
fee of $14,000 per month.

b.   In or around August 2014, October 2014, November 2014,
and June 2015, which were after the Syracuse Developer was named CNSE's
preferred developer for Syracuse as set forth below, the Syracuse

Developer paid Howe bonuses totaling at least approximately $385,000. These bonuses were not paid to the Government Relations Firm.  Rather, $135,000 in bonuses were paid to Howe's LLC, and $250,000 in bonuses were paid directly to Howe.

    c.    Further, I have learned from Howe that he kept AIELLO informed as he (Howe) negotiated his role at CNSE with ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, and that Howe informed AIELLO and GERARDI of his official role and influence within CNSE.  This fact has been corroborated by, among other things, an interview of a principal of another development company who worked with Howe, who stated that Howe told him, in substance and in part, that Howe acted as an agent and representative of CNSE in finding partners for development projects; interviews with certain State employees; and emails (including ones described below) in which Howe forwarded to AIELLO and GERARDI communications with KALOYEROS and other individuals associated with CNSE in which internal CNSE business was discussed.

    72.    Based on my review of emails, publicly available and other documents, and interviews with, among others, Howe, I learned that throughout 2013 and 2014, LOUIS CIMINELLI, MICHAEL LAIPPLE, and KEVIN SCHULER, the defendants, caused the Buffalo Developer to pay Howe as a "consultant" knowing that he was acting as an agent and representative of CNSE and intending for him to use his official position for their benefit, as set forth below.

    a.    In or around January 2013 -- just as the Buffalo Developer began seeking large State contracts through the Governor's Buffalo Billion initiative -- SCHULER, on behalf of the Buffalo Developer, entered into an agreement with the Law Firm, through which the Government Relations Firm would provide "strategic advice and counsel regarding business generation initiatives across New York State."  The agreement specified that it would not include any lobbying of State or Federal officials.  In return for Howe's services, the Buffalo Developer agreed to pay $100,000 per year. Prior to this agreement, the Buffalo Developer had not retained or paid any money to Howe or the Government Relations Firm.

    b.    I believe, based on my review of emails and interviews with, among others, Howe, that before and during the time in which CIMINELLI, LAIPPLE, and SCHULER caused the Buffalo Developer to pay Howe, they knew that Howe was an agent of CNSE who had substantial

61

influence with ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, the President of CNSE and a board member of Fort Schuyler.  In particular, Howe has stated that, in or around the end of 2012, he approached CIMINELLI and told CIMINELLI, in substance and in part, that he (Howe) was acting on behalf of the Office of the Governor and CNSE, which were looking for help in creating large development projects in the Buffalo area.  CIMINELLI, LAIPPLE, and SCHULER's knowledge that Howe was acting as an agent and representative of CNSE has been corroborated by, among other things and as noted above, an interview of a principal of another development company who worked with Howe, interviews with certain State employees, and emails in which Howe forwarded to LAIPPLE and SCHULER communications with KALOYEROS and other individuals associated with CNSE in which internal CNSE business was discussed. For example:

       i.      On or about October 7, 2013, Howe forwarded to LAIPPLE and SCHULER an email exchange between Howe and KALOYEROS in which Howe and KALOYEROS discussed internal CNSE matters, including personnel matters, as well as the timing and method of the announcement of the Buffalo RFP.  In his email to LAIPPLE and SCHULER, Howe stated, "we decided to get this Buffalo [RFP] out asap."

       ii.     On or about December 3, 2013, Howe forwarded an email·between him, a partner at the law firm representing CNSE, and a representative of another company that had business with CNSE, discussing business between that other company and CNSE.  In his email to LAIPPLE and SCHULER, Howe wrote, among other things, "Keep this close to the vest."

    73.   Prior to the Fort Schuyler bidding process, individuals associated with the Syracuse Developer, including STEVEN AIELLO and JOSEPH GERARDI, the defendants, and the Buffalo Developer, including LOUIS CIMINELLI, the defendant, had become significant contributors to the Governor's election campaigns.  I believe that these contributions were intended at least in part to develop a relationship with the Office of the Governor that would help enable the Syracuse Developer and the Buffalo Developer to obtain State-funded development contracts.  Evidence of this intent includes the following:

       a.    Based on my review of publicly available records and interviews of Howe, I learned that from in or around 2001 through

in or around 2010, the Syracuse Developer did not make large
contributions to State gubernatorial campaigns -- contributing a
total of approximately $39,000 over that ten-year period. Similarly,
prior to the fall of 2011, AIELLO made two contributions to the
Governor's campaign, each in the amount of $5,000, and GERARDI made
no contributions to State gubernatorial campaigns. During these
years, as set forth above, the Syracuse Developer's business focused
principally on private development projects. Beginning in December
2011, however, as the Syracuse Developer began to seek State-funded
development work with the assistance of Howe, contributions from its
executives and related parties increased dramatically. Beginning in
December 2011, after the Syracuse Developer retained Howe, AIELLO,
GERARDI, and other executives from the Syracuse Developer -- largely
at the direction of Howe -- personally began making, and directed
the Syracuse Developer to make, substantial campaign contributions
to the Governor's campaign and related entities. Specifically, from
December 2011 through 2013, AIELLO, GERARDI, their family members,
another executive of the Syracuse Developer ("Syracuse Developer
Executive-1"), an entity associated with Syracuse Developer
Executive-1, and the Syracuse Developer itself contributed at least
approximately $250,000 to the Governor's election campaigns, with
each contribution being in an amount of $10,000 or greater. Notably,
on or about July 9, 2013, which, as described below, was approximately
one month before AIELLO and GERARDI supplied information to Howe to
use to rig the Syracuse RFP, AIELLO, GERARDI, their family members,
Syracuse Developer Executive-1, and the Syracuse Developer together
contributed approximately $65,000 to the Governor's election
campaign. The following day, on or about July 10, 2013, an entity
associated with Syracuse Developer Executive-1 made a $60,000
contribution to the Governor's election campaign. As a result of
these contributions, the Syracuse Developer has been publicly
reported as the top donor to the Governor in or around upstate New
York.

b.    I know from my review of emails and interviews with
Howe that Howe encouraged AIELLO and GERARDI to make contributions
to the Governor's campaigns and to make contributions in higher
amounts so that the Governor's Office would know and remember them.
For example, on or about May 18, 2011, Howe sent an email to AIELLO,
in which Howe instructed, "you should hold on making any political
$$ contributions to any state or federal electeds, so we can make
sure you can [get] the most leverage out of them."

c.   Between in or around December 2009 and January 2014, CIMINELLI and his immediate family members contributed at least $100,000 to the Governor's election campaigns. Additionally, in or around November 2013 -- when the Buffalo Developer's bid to become a preferred developer was under consideration by Fort Schuyler, as described below -- CIMINELLI hosted a fundraising dinner for the Governor, at which approximately $250,000 was raised.

d.   Further, JOSEPH PERCOCO, a/k/a "Herb," the defendant, made specific requests to Howe for both the Syracuse Developer and the Buffalo Developer to make donations to the Governor's campaign, and Howe relayed those requests to the Syracuse Developer and the Buffalo Developer. For example, on or about November 12, 2013, PERCOCO wrote an email to Howe, in which PERCOCO stated that a commitment by CIMINELLI to host the fundraising dinner described above in which $175,000 would be raised for the Governor's re-election campaign "does not work Herb," because CIMINELLI had previously committed to a higher amount. As noted, the dinner ultimately raised approximately $250,000.

### C. *Fort Schuyler Was Defrauded into Awarding State Development Contracts to the Syracuse Developer and the Buffalo Developer*

74.   Based on my review of emails, publicly available and other documents, and interviews with, among others, Howe, I learned that in 2013, ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, and Howe developed a plan to identify preferred developers for potential construction projects associated with CNSE in Syracuse and Buffalo, New York. This plan was motivated, in part, by the announcement of the Governor, in or about January 2012, that the State would invest $1 billion in Buffalo, New York. This plan included issuing two requests for proposal (the "RFPs"), one for Syracuse (the "Syracuse RFP") and one for Buffalo (the "Buffalo RFP"), that would give the appearance of an open competition to choose "preferred developers" in Syracuse and Buffalo. However, the Syracuse Developer and the Buffalo Developer had been preselected by KALOYEROS and Howe to become the preferred developers in Syracuse and Buffalo, respectively, after the Syracuse Developer and the Buffalo Developer had each made sizable contributions to the Governor and had begun paying Howe for Howe's access to the Governor and for Howe's influence over the RFP processes. These preferred developer contracts were particularly lucrative for the Syracuse Developer and the Buffalo Developer, as the Syracuse

64

Developer and the Buffalo Developer were then entitled to be awarded
future development contracts of any size in Syracuse or Buffalo,
respectively, without additional competitive bidding, and thus
without competing on price or qualifications for particular projects.
In order to award these valuable deals to the Syracuse Developer and
Buffalo Developer, KALOYEROS and Howe manipulated the RFP process
to prevent Fort Schuyler from receiving or being able to fairly
consider competing bids.

### i.   Fort Schuyler Issued RFPs for Preferred Developers for Syracuse and Buffalo

75.   Based on publicly available and corporate documents, and
interviews with, among others, employees and members of the Board
of Directors of Fort Schuyler, I have learned that the Board of
Directors of Fort Schuyler has the authority to enter into agreements
with private companies in which public funds will be spent to pay
the companies to build facilities for CNSE.  Prior to entering into
a significant contract with private companies, Fort Schuyler
typically issues a "request for proposal."  "Request for proposal"
is a term of art that refers to a type of solicitation in which an
organization such as Fort Schuyler sets forth the fact that funding
is available for a project and seeks bids from qualified and interested
parties.  I know from speaking with members of Fort Schuyler's Board
of Directors that, particularly with respect to State-funded
projects, RFPs issued by Fort Schuyler were supposed to be designed
and drafted to provide a fair, open, and competitive bidding process
with respect to both quality and price, and accordingly should not
be drafted to favor any particular potential bidder and should not
be provided to any parties in advance of publication.

76.   Further, I learned that in or around 2013 and 2014, the
Research Foundation had policies governing procurement that were used
by Fort Schuyler.  As set forth in these policies, the procurement
process was intended "to promote open and free competition in
procurement transactions" and "to ensure that procurements are priced
competitively and that the selection process is not influenced
improperly."  Among other things, the policies required that
"[s]uppliers that develop or draft specifications, requirements,
statements of work, or requests for bids or proposals for a procurement
must be excluded from competing in any resulting procurement."

77.    Based on my review of emails, publicly available documents and interviews of members of the Board of Directors of Fort Schuyler, I learned the following regarding the process by which the Board of Directors selected preferred developers for Syracuse and Buffalo:

a.    On or about August 20, 2013, ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, sent an email to Howe and to an executive of Fort Schuyler (the "Fort Schuyler Executive"), in which KALOYEROS told the Fort Schuyler Executive that KALOYEROS would "like to issue an RFP for a strategic partner in Syracuse and a similar one in Buffalo. It should not focus on a specific project, but more on a strategic partnership with local developers who know the two regions, are grass root, have the construction and business credibility, and are willing to expand in jobs and investments in those regions in partnership with CNSE."

b.    As set forth in more detail below, KALOYEROS and Howe worked together to draft the Syracuse and Buffalo RFPs.  I know, based on interviews of, among others, a former executive of Fort Schuyler, that KALOYEROS maintained close oversight and control over the day-to-day operations of CNSE and Fort Schuyler, including over the design of development projects and the drafting of RFPs.

c.    In or around October 2013, the Board of Directors of Fort Schuyler, by resolutions of the Board, issued the Syracuse and Buffalo RFPs, which requested proposals "for a strategic research, technology outreach, business development, manufacturing, and education and workforce training partnership with a qualified local developer" in the greater Syracuse area and in the greater Buffalo area, respectively.  Because the RFPs were designed to select preferred developers that would, once chosen, be able to obtain potentially hundreds of millions of dollars in State-funded contracts from Fort Schuyler without further competitive bidding, the RFP selection process had substantial economic importance for both Fort Schuyler and the Research Foundation, through which such future contracts would be funded. The Board Resolutions authorizing the RFPs each stated that the Fort Schuyler Board would approve a contract only "[u]pon completion of a competitive RFP process and evaluation of responses."  The RFPs themselves explained that Fort Schuyler would appoint a selection committee to review submissions, which would recommend the selection of a preferred developer to the Board of Directors of Fort Schuyler.  The Board of Directors of Fort Schuyler

had the final authority for making the selection of preferred
developers and authorizing contracts.

       d.   Despite the highly lucrative nature of the contracts,
the Syracuse Developer ultimately was the only party to bid on the
Syracuse RFP, and the Buffalo Developer was one of only three parties
to bid on the Buffalo RFP.

       e.   In or about December 2013, the Board of Directors of
Fort Schuyler voted to name the Syracuse Developer the preferred
developer for Syracuse, and in or about January 2014, the Board of
Directors of Fort Schuyler voted to name the Buffalo Developer one
of two preferred developers for Buffalo.  The Board of Directors based
its decisions on, among other things, matrices created by the
evaluation committee in which the evaluation committee compared each
bidder's submission to the qualifications set forth in the relevant
RFP.

## ii.   The Syracuse RFP Was Designed to Defraud Fort Schuyler

     78.   Based on my review of emails and interviews of, among
others, Howe, I learned, that, unbeknownst to members of the Board
of Directors of Fort Schuyler, the Syracuse RFP was designed so that
the Board of Directors of Fort Schuyler would have no choice but to
name the Syracuse Developer the preferred developer for Syracuse,
as follows:

       a.   In or about August 2013, Howe informed JOSEPH GERARDI
and STEVEN AIELLO, the defendants, that Fort Schuyler would issue
the Syracuse RFP.  On or about August 15, 2013, GERARDI sent an email
to Howe, copying AIELLO and another executive of the Syracuse
Developer.  The subject line of the email stated: "[Syracuse
Developer] Company Qualifications and Experience."  Attached to the
email was a document entitled "[Syracuse Developer] Company
Qualifications.08-15.13" (the "Syracuse Developer Qualifications").

       b.   The Syracuse Developer Qualifications contained a
list of qualifications of the Syracuse Developer and its executives,
including AIELLO and GERARDI.  For example, the Syracuse Developer
Qualifications stated that employees use "Sophisticated project
management tools, such as InSite SiteWork (www.insitesoftware.com)
to accurately and efficiently coordinate all aspects of site and

utility construction, to create ideal building conditions, and USGlobalNet, or USGN's (www.usgn.net) web-based project management software, to effectively manage all projects on budget and on schedule."

      c.    On or about August 16, 2013, Howe replied to GERARDI'S email containing the Syracuse Developer Qualifications, writing "This works. Let me hand deliver to dr k. You guys should not email this to anyone but me. All good."  I know based on my review of email and interviews with Howe and others that "Dr. K" is a nickname for ALAIN KALOYEROS, a/k/a "Dr. K," the defendant.  Howe has explained that he sent this email because he did not want anyone else at CNSE or Fort Schuyler, other than himself or KALOYEROS, to learn of their scheme.

      d.    As described above, on or about August 20, 2013, KALOYEROS sent to Howe and to the Fort Schuyler Executive an email directing the Fort Schuyler Executive "to issue an RFP for a strategic partner in Syracuse and a similar one in Buffalo."

      e.    The following day, on or about August 21, 2013, Howe responded to KALOYEROS only, at KALOYEROS's work email address, stating "I have 'vitals' for buffalo and Syracuse friends."  Howe has explained that "buffalo and Syracuse friends" referred specifically to the Buffalo Developer and the Syracuse Developer, respectively. Howe has further explained that the word "friends" was used to refer to "friends of the Governor," and that the Buffalo Developer and Syracuse Developer qualified as "friends" due, in part, to their donations to the Governor's campaigns and, in part, due to their relationship as clients of Howe.  Furthermore, "vitals" referred to information about the Buffalo Developer and the Syracuse Developer that would be used to tailor the RFPs so that the Buffalo Developer's and the Syracuse Developer's proposals would be selected.

      f.    Later that day, on or about August 21, 2013, KALOYEROS, using his personal "gmail" address, responded to Howe's email and stated, "Please gmail not email."[11]  Howe then asked in an email to

---

    [11] It appears that KALOYEROS forwarded Howe's email to his personal "gmail" address before responding.

KALOYEROS, "did you understand that gmail email I sent this morning?"
KALOYEROS responded, apparently sarcastically, "Vitals is so
complicated to understand that I was hoping you'd break it down for
me in 3 letter words, 2 word sentences."

g.   On or about August 23, 2013, Howe sent an email to
KALOYEROS at KALOYEROS's gmail account with the subject "FW: [Syracuse
Developer] Company Qualifications and Experience."  Attached to that
email was the Syracuse Developer Qualifications, which Howe has
explained were sent to him from GERARDI and AIELLO to be used in the
development of the Syracuse RFP.

h.   On or about September 13, 2013, KALOYEROS sent an email
to several executives and employees of CNSE and Fort Schuyler and
to Howe that contained a draft of the Syracuse RFP (the "Draft Syracuse
RFP").  Howe forwarded the email and the Draft Syracuse RFP to AIELLO
and GERARDI, writing "FYI---they are fine tuning now, but expect to
release to public this week….what do you think? Keep Confidential
pls."  Under the heading "Developer Requirements," the Draft Syracuse
RFP provided, among other things, the following language, which is
nearly identical to language excerpted above from the Syracuse
Developer Qualifications: the developer should use "sophisticated
tools and advanced capabilities (such as InSite Sitework
(www.insitesortware.com) to accurately and efficiently coordinate
all aspects of site and utility construction, to develop ideal
building conditions, and USGlobalNet, or USGN's (www.usgn.net)
web-based project management software) to effectively manage projects
expeditiously, professionally, on-time, and within budget."

i.   On or about September 13, 2013, GERARDI replied by
email to Howe and AIELLO, attaching a scanned version of the Draft
Syracuse RFP that contained GERARDI's handwritten notes.  These
handwritten notes included the following:

i.     In the paragraph of the Draft Syracuse RFP quoted
above, the phrases "(such as InSite Sitework
(www.insitesortware.com)" and "USGlobalNet, or USGN's
(www.usgn.net)" were underlined, and in the margin was written "too
telegraphed??  I would leave out these specific programs."  Based on
the context of this email and others, and interviews with Howe, I
believe that GERARDI was expressing his concern that including these

69

specific qualifications in the RFP would make it too obvious that the RFP was being rigged to favor the Syracuse Developer.

      ii.    In a section of the Draft Syracuse RFP that stated that "the response to the RFP must specifically include . . . Latest audited financial statement for DEVELOPER," the word "audited" was crossed out in GERARDI's handwritten notes, and in the margin was written, among other things, "not available – typically prepared for not-for-profits, or public corp." Howe has explained that, based on his experience working with the Syracuse Developer, GERARDI and AIELLO were concerned about any requirement for audited financial statements because such a requirement had disqualified them from previous public contracts.

      j.    On or about September 13, 2013, several hours after sending the Draft Syracuse RFP containing the handwritten notes to Howe, GERARDI sent another email to Howe, copying AIELLO, reiterating that the Syracuse RFP should not include a requirement of audited financials, and suggesting instead that it read, "Latest audited financial statement if available, or other financial information/statements that demonstrate the DEVELOPER's financial qualifications." On or about September 16, 2013, Howe sent to KALOYEROS an email stating: "On syr rfp , where it says 'audited financials' just need to add an additional few words, 'audited financials or letter of financial reference from major financial institution.'"

      k.    On or about September 24, 2013, Howe forwarded to AIELLO and GERARDI a revised draft Syracuse RFP. This revised draft Syracuse RFP still contained the phrases "(such as InSite Sitework (www.insitesortware.com)" and "USGlobalNet, or USGN's (www.usgn.net)," but after the phrase "Latest audited financial statement for DEVELOPER" the phrase "or letter of financial reference from major financial institution" was included, as had been requested by AIELLO and GERARDI via Howe.

      l.    Despite having retained Howe and worked with Howe to tailor the Syracuse RFP to match the qualifications of the Syracuse Developer, the Syracuse Developer's RFP submission (which was affirmed by JOSEPH GERARDI, the defendant) falsely stated that no one "was retained, employed or designated by or on behalf of [the Syracuse Developer] to attempt to influence the procurement process."